# Richmond.

United States Mutual Accident Association v. Newman.

November 17th, 1887.

1. Insurance Policy—*Rules of construction.*—Same rules of construction apply to this, as to other instruments. Its language is to receive a reasonable construction, and its intent and substance should be regarded. Where two constructions can be given it, that most favorable to insured must be given. Where there is doubt as to meaning of terms employed by company to except it from liability, they are to be construed most strongly against insurer.

2. Idem—*Accident policy—Death from coal gas—Instructions—Case at bar.*—Accident policy taken for benefit of plaintiff, contained clause that no recovery could be had, unless it was proved that death of insured was "caused by external, violent, and accidental means," or where "caused by taking poison, or by contact with poisonous substances." Insured was found dead in bed at hotel from inhaling coal gas. Testimony was conflicting as to whether coal gas was "poison or poisonous substance":

Held:

It was not error that the court refused to instruct the jury that inhaling coal gas was a taking of poison, if they believed coal gas to be a poisonous substance, which, when inhaled, destroyed life.

3. Idem—*Case at bar.*—The policy contained clause that "the benefits shall not extend to any bodily injury of which there shall be no external and visible signs upon the body of the insured." Evidence showed that, when found, body of insured had bloody froth at the mouth, spots of blood on face and breast, and red spots on body:

Held:

It was not error for the court to refuse to instruct the jury that if there were no visible signs of injury upon body of insured, except the froth and red spots, that did not constitute visible and external signs of injury, as it was a fact properly determinable by the jury.

Argued at Staunton.   Decided at Richmond.   Error to judgment of circuit court of Augusta county rendered December 3d, 1886, in an action on an accident policy wherein Nora Newman, by her next friend, was plaintiff, and the United States Mutual Accident Association was defendant.   At the trial instructions were asked for by the defendant, and refused, and others given in lieu thereof; to which the defendant excepted.   The verdict was for the plaintiff and judgment was entered accordingly, for $3,000.   A writ of error and *supersedeas* was obtained by the defendant.   Opinion states the case.

*Sheffey & Bumgardner*, for the plaintiff in error.

*Elder & Nelson*, and *G. M. Cochran*, for the defendant in error.

Lacy, J., delivered the opinion of the court.

This case is as follows : On the 14th day of November, 1884, a certificate of membership was issued to one James E. Newman for the benefit of his sister Nora Newman, a child of about five years of age.   On the morning of September 3rd, 1885, the said James E. Newman was found dead in bed, in a public hotel in the city of Richmond.   He had retired to bed about eleven o'clock the night before, and had requested the servant to call him about six o'clock in the morning.   The servant upon entering the room next morning about six o'clock, found the room full of coal gas and James E. Newman dead in bed as stated above.   Others were called, among them the proprietor of the house, a policeman, and the coroner of the city.   The evidence shows that the dead man was lying in bed in quite a natural position, with a ball of tough froth over his mouth, slightly tinged with blood, and some red splashes on the side of his face, and on his breast.

All the indications showed that he had been killed by the

coal gas. The insurance company, the said "The United States Mutual Accident Association" being notified of this death and its character, and payment being demanded of the amount of the policy, which was $5,000, the said company refused to pay the same upon the ground that the deceased came to his death by poison, and that there were no external and visible signs of bodily injury upon the body of deceased; the policy in question containing a provision "that benefits under this certificate shall not extend to any bodily injury, of which there shall be no external and visible sign. upon the body of the insured, nor to any bodily injury happening directly or indirectly, in consequence of fits, &c., nor to any death or disability which may have been caused, wholly or in part or jointly, by hernia, &c., or by the taking of poison or contact with poisonous substances, nor to any case of death or personal injury, unless the claimant under this certificate shall establish by direct and positive proof that the said death or personal injury was caused by external, violent, or accidental means." Suit was thereupon instituted in the circuit court of Augusta county. Upon the trial much evidence was adduced both by the testimony of witnesses and by deposition. Instructions were asked on both sides, some of which were given and some refused by the trial court, and exceptions taken to the rulings of the court upon the trial, and there was verdict and judgment for the plaintiff for $3,000; whereupon the defendant company applied for and obtained a writ of error to this court.

There was no motion in the court below to set aside the verdict as contrary to the law and the evidence, and the questions arising here are upon the exceptions taken in the said court to rulings there upon the instructions given to the jury and refused by the court. The instructions refused by the court were the fourth, fifth, and eighth instructions asked by the defendant.

The fourth instruction is as follows: "Fourth, That if the jury

shall believe from the evidence that the plaintiff has estab-
lished by direct and positive proof that James E. Newman died
from bodily injuries effected through external, violent, and
accidental means, and by such means alone, and that there
were external and visible signs of such injuries upon the body
of said James E. Newman at the time of his death; still if
they believe from the evidence that such bodily injuries were
caused by the taking of poison, or by contact with poisonous
substances on the part of said James E. Newman, whether
intentionally or unintentionally, whether accidentally or other-
wise, howsoever, the plaintiff cannot recover, under the con-
tract sued on in this case; and the jury are further instructed
that the inhalation by said Newman of coal gas will suffice, if
they believe from the evidence that such gas was a poisonous
substance, and caused the death of said James E. Newman,
and if they so believe from the evidence, they must find for the
defendant."

The fifth instruction was as follows: "Fifth, That words in
written contracts, unless they are technical in their character,
must be construed according to their common acceptation and
popular meaning; if therefore the jury shall believe from the
evidence that James E. Newman's death was caused by the
inhalation of coal gas, that such gas when so inhaled destroys
life, is considered and classed by medical men and writers gen-
erally as a poisonous substance, and is recognized as a poison
in popular and common acceptation, then they must construe
the words poison and poisonous substances, as including such
coal gas; and if they believe that said James E. Newman's
death was caused by the inhalation of such poisonous coal gas,
they must find for the defendant."

The eighth instruction was as follows: "Eighth, If the jury
believe from the evidence that when first discovered on the
morning of the 3rd of September, 1885, the body of James
E. Newman had been dead from four to six hours, that there
were no visible signs of violence upon the body; that there

was a ball of froth at the mouth, and some splotches resembling the eruption of measles on one side of the body; that such froth on the mouth and red splotches are not unusual consequences of asphyxia after death, whatever the cause of such asphyxia may have been, and that in other respects the body was in a placid and natural state, without signs of distortion or struggle, then the jury are instructed that neither the dead body itself, nor such froth nor splotches constitute the external and visible signs of injury upon the body of James E. Newman, effected through external, violent, and accidental means as spoken of and required in and by the policy sued on, and as are referred to in the instructions already given to the jury; and without proof of which to the satisfaction of the jury, they must find for the defendant."

The court refused to give the said fourth and fifth instructions because they were misleading and calculated to exclude from consideration the theory of suffocation.

The eighth instruction was rejected by the court because it invaded the province of the jury, and determined what properly belonged to them, in the opinion of that court.

The court had already instructed the jury by the first instruction asked by the defendant—that the plaintiff in this action can recover only upon the contract evidenced by the policy of insurance, or certificate of membership dated 14th of November, 1884, including the application for membership made part thereof, and the conditions contained therein, and they must give effect to each and every provision and stipulation thereof according to the evidence before them, and they have no right to disregard any part of the same upon any theory or opinion of theirs that it ought to have been different from what it is; and secondly, that to entitle the plaintiff to recover anything in this action, she must establish by direct and positive proof that James E. Newman died from bodily injuries, effected through external, violent and accidental means, and that his death was caused alone by such external,

violent, and accidental means; and the burden of proving this by direct and positive evidence rests upon the plaintiff.

And by the defendant's third instruction, that to entitle the plaintiff to recover, she must by direct and positive proof establish the fact that James E. Newman died from bodily injuries effected through external, violent and accidental means, and by such means alone; but she must also satisfy the jury that there were external and visible signs upon the body of the said James E. Newman of such injuries at the time of his death.

The jury, upon the motion of the defendant, had also been instructed in the sixth instruction as to the change of employment on the part of the deceased from a clerk to that of a bartender, which reduced the recovery from $5,000 to $3,000, as provided for a change of employment to one more hazardous, as a bar-tender was regarded by the policy; and, by the seventh instruction as to the necessity for notice of death, &c., as required by the policy, in order to entitle the beneficiary to any recovery.

Having so instructed the jury on the motion of the defendant, the court gave an instruction on the motion of the plaintiff in lieu of the fourth, fifth, and eighth instructions of the plaintiff rejected by the court. This instruction given on the motion of the plaintiff was as follows:

"The court instructs the jury that it is for the jury to determine, upon all the evidence in this cause, whether the monoxide of carbon, sometimes known as carbonic oxide, is poisonous or not within the intent and meaning of the words poison or poisonous substances, as used by way of exceptions and proviso in the policy in suit; and even if they should believe that it is poisonous, within such intent and meaning, yet if they believe that the death of James E. Newman was not caused by this carbonic oxide, but by the elements of coal gas with which it was combined, and that such other elements were not poisonous, but acted by way of asphyxiation or suffocation, then this

would be death by external, violent, and accidental means within the intent and meaning of the policy. This of course is based upon the supposition that James E. Newman came to his death by breathing coal gas in which carbonic oxide was present; facts which are for the jury to determine on the evidence."

The principles upon which contracts of insurance are to be construed, are well understood in the profession and have been clearly laid down in this and other appellate tribunals, and are to be found in all the text writers. The principles applicable to them are the same as those which obtain in the construction of other contracts; the same rule of construction which applies to other instruments, apply to these, also. They are to be construed according to the sense and meaning of the terms used. Their terms are to be understood in their plain, ordinary, and popular sense, unless they have generally in respect to the subject matter, as by the known usage of trade, acquired a peculiar sense distinct from the popular sense—rendering it necessary to resort to extrinsic proof in order to determine in which sense they are used, and so to explain their ambiguity; or, unless the context evidently points out that they must, in the particular instance and in order to effectuate the immediate intention of the parties, be understood in some special and peculiar sense. Lord Ellenborough in *Robertson* v. *French,* 4 East., 135.

It is a contract, and is to be governed by the same principles as govern other contracts. Its language is to receive a reasonable interpretation; its intent and substance, as derived from the language used, should he regarded; full legal effect should always be given to it, for the purpose of guarding the company against fraud and imposture. Beyond this we would be sacrificing substance to form—following words rather than ideas. *Cornfoot* v. *Fowke,* 6 Mees. and W., 358; *Farley* v. *North American Fire Ins.' Co.,* 25 Wend., 374; *Home Ins. Co.* v. *Baltimore Warehouse Co.,* 93 U. S., 527; *Murray* v. *Hatch,* 6 Mass., 465;

*Home Ins. Co.* v. *Gwathmey*, 82 Va., 923.   And in a case where
it can be fairly claimed that two constructions can be placed
upon the language used in the policy, it is now well settled
that the one is to be adopted which is most favorable to the
insured; and in case of doubt as to the meaning of terms
employed by an insurance company, they are to be construed
most strongly against the insurer.   *Westfall* v. *Hudson River
Fire Ins. Co.*, 2 Duer, 490; *Cropper* v. *Western Insurance Com-
pany*, 32 Pa. St., 351; May on Insurance, sec. 172, *et seq.;*
Wood on Ins., sec. 156, sections 125–129.   Justice Story
said, (in *Palmer* v. *Warren Ins. Co.*, 1 Story Rep.,) " I take
the rule to be clearly established, as a general rule, that
words of exception in any instrument are to be construed most
strongly against the party for whose benefit they are intro-
duced; and this rule has been expressly applied to words of
exception in policies of insurance as well in England as in this
court."   Citing *Blacket* v. *Royal Exchange Ins. Co.*, 2 Cromp.
and Jer., 244, and other cases.   *Verba fortius accipiuntur contra
proferentur.*   Now for whose benefit are these words intro-
duced?   Clearly for the benefit of the underwriters, as they
are to relieve them from risks, for which they would otherwise
be liable under the general words of the policy.   They are not
in form or in substance the words of the insured, but words of
exception used by the underwriters to exempt them from the
general rule which would otherwise attach upon them during
the whole term of time for which the policy was to endure;
citing *Yeaton* v. *Fry*, 5 Cranch's R., 355.   And Lord Hale
once said: " The judges ought to be curious and subtle to
invent reasons and means to make acts effectual according to
the just intent of the parties; they will not therefore cavil
about the propriety of words, when the intent of the parties
appear, but will rather apply the words to fulfill the intent
than to destroy the intent by reason of the insufficiency of the
words."   *Crossing* v. *Scudamen*, 2 Lev., 9.   The language of a
policy is to be construed according to its natural meaning, its

ordinary and usual signification—except when such a construction would render the words used senseless, or it is evident from the general scope and intent of the instrument that the words were used in some other sense.

As we have seen above, one of the exceptions contained in this policy was when death was caused by taking poison, or contact with poisonous substances; there was much conflict in the evidence given by experts sworn in the case, as to the meaning of poison, and whether coal gas was a poison, and whether death by inhaling coal gas was a death caused by the poisonous elements admitted to be present therein, or by suffocation or asphyxia, caused by inhaling this irrespirable substance before the poisonous elements had time to act.

Professor Mallet, a sworn expert in the case, and a distinguished medical chemist, and incumbent of the chair of chemistry and toxicology at the University of Virginia, after giving the constituents of coal gas, said: "In cases of death by coal gas, there are two causes active in producing death; one, carbonic oxide, acts directly, the other gases act simply by excluding the air; ultimately it is asphyxia in both cases; carbonic acid is a poison, using the word poison in a loose sense, and in the same loose sense you would call water a poison. Carbonic oxide produces death in the same way as does carbonic acid, but it can be called more poisonous than carbonic acid, if volume is to be considered, it not requiring so much carbonic oxide as carbonic acid to cause death. In death by suffocation or asphyxia, the lack of oxygen to supply the system stimulates the nerve centre at the base of the brain to exhaustion; when it reaches the point of exhaustion, it fails to control the respiratory muscles, and they cease to act. Death is caused in this way, *i. e.*, by suffocation, by carbonic acid, by carbonic oxide, choking, drowning, &c. Death by suffocation or asphyxiation results from the cutting off of the supply of oxygen for the blood, and the prevention of the discharge of carbonic acid in the blood. Coal gas kills both by shutting off the supply

of oxygen and preventing the discharge of carbonic acid in the blood. If there were no carbonic oxide in coal gas, it would still certainly produce death. Using the word poison in a loose and general sense, both carbonic oxide and carbonic acid are poisonous. Used in a strict sense, neither are poisons—both cause death by suffocation. Using the word poison in a loose sense, a great many things are called poisons—in the sense of poisoning—that is to say, they produce death, while strictly speaking, they are not poisons. Ground glass taken into the stomach will cause death, in which case it is said often, that a person was poisoned by it, when, in fact, death was caused by inflammation or ulceration of the bowels, caused by the glass. Did I use the word poison in a loose sense, I would say a person drowned was poisoned. If you say a man was poisoned by coal gas, you would have to say a man drowned was poisoned by water. Poison is a substance when taken into the body, is capable of destroying some part or parts of the body, so as to leave them permantly incapable of performing their functions. Carbonic acid is always in the blood, and as such is not a poison under the above definition. Carbonic oxide is not a poison under my definition, because it is given off from the blood in the same way as carbonic acid, only more slowly.

And he gave it as his opinion from the evidence of the undertaker as to the color of the blood which issued from the body during the embalming process, that there was no carbonic oxide present. He said, "from the evidence in this case, all of which I have heard, in my opinion Newman's death was caused by external, violent, and accidental means." Other views were presented by other chemists, some of them differing from and in conflict with the views of Dr. Mallet. But under the circumstances detailed, and the state of the evidence, the circuit court did not err in refusing to instruct the jury in effect that inhaling coal gas was a taking of poison, if they believed coal gas to be a poisonous substance, which when

inhaled destroys life; and the fourth and fifth instructions were properly substituted by the instruction given.

The eighth instruction was properly rejected, because it in terms asserted conclusions of fact properly determinable by the jury as to whether there were external signs of injury upon the body, whereas the jury might well find that there had been injury to the body when death had actually occurred. And we are further of opinion that the law of the case was correctly expounded to the jury by the instructions given by the court, and that there is no error in the action of the court in giving said instructions to the jury.

We think there is no error in the judgment of the circuit court of Augusta county complained of, and the same must be affirmed.

JUDGMENT AFFIRMED.