**GITLOW v. KIELY, Postmaster of City of New York.**

District Court, S. D. New York.

Oct. 16, 1930.

Arthur Garfield Hays, of New York City (Oscar Stabiner, of New York City, of counsel), for complainant.

Charles H. Tuttle, U. S. Atty., of New York City (Samuel C. Coleman, Asst. U. S. Atty., of New York City, and William C. O'Brien, Asst. Atty. to Post Office Department, of Washington, D. C., of counsel), for defendant.

WOOLSEY, District Judge.

The motion for an injunction pendente lite is denied, and the motion to dismiss the complaint herein is granted.

■ I. The scope for judicial review of the decision of the Post Office Department which the defendant herein has made effectual by the exclusion order of July 16, 1930, is very narrow.

In Bates & Guild Co. v. Payne, 194 U. S. 106, at page 109, 24 S. Ct. 595, 597, 48 L. Ed. 894, the propriety of a ruling of the Postmaster General was in question, and after a full discussion of the cases, in which a review of the action of the head of an executive department had been sought in the courts, Mr. Justice Brown stated the principle applicable to such review as follows: "The rule upon this subject may be summarized as follows: That where the decision of questions of fact is committed by Congress to the judgment and discretion of the head of a department, his decision thereon is conclusive; and that even upon mixed questions of law and fact, or of law alone, his action will carry with it a strong presumption of its correctness, and the courts will not ordinarily review it, although they may have the power, and will occasionally exercise the right of so doing." To the same effect is Masses Publishing Co. v. Patten, 246 F. 24, at pages 31–33, L. R. A. 1918C, 79, Ann. Cas. 1918B, 999 (C. C. A. 2) and the cases cited therein.

On page 14 of his supplemental memorandum, counsel for the plaintiff admits, in substance, the position just above stated, because he says: "We concede that the determination of the Postmaster General cannot be upset unless, in the opinion of the court he is 'clearly wrong.' "

II. There are, however, two questions which must be disposed of before the real point in issue is discussed.

■ First. On the assumption that the "Revolutionary Age" should be considered to be a newspaper—a question which it is unnecessary for me to decide—its publishers in their somewhat vociferous challenge to the postal authorities contend that the exclusion of the issue of July 15th from the mails is an interference with the freedom of the press guaranteed by the federal Constitution. This is not so.

■ It is well settled that the freedom of the press is not interfered with except by suppression of a newspaper before publication.

If a newspaper is allowed to be published, the constitutional right of a free press is secured to it, and thereafter its publishers must be responsible for their acts as every one else is; and if they choose to publish matters that are criminal, libelous, or otherwise forbidden by law, they must take the consequences. Patterson v. Colorado, 205 U. S. 454, 462, 27 S. Ct. 556, 51 L. Ed. 879, 10 Ann. Cas. 689.

The First Amendment of the Constitution which covers the question of freedom of speech and of the press provides: "Congress shall make no law respecting an establishment of religion, * * * or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress."

The meaning of freedom of the press in the amendment and the relation thereto of exclusion from the mails was fully discussed by the Circuit Court of Appeals for this Circuit in Masses Publishing Co. v. Patten, 246 F. 24, L. R. A. 1918C, 79, Ann. Cas. 1918B, 999. In passing on the constitutionality of the Espionage Act of June 15, 1917 (40 Stat. 217), the court said, at page 27 of 246 F.:

"In his Commentaries on the Laws of England Mr. Justice Blackstone in speaking of the liberty of the press declares that it is 'essential to the nature of a free state.' It

consists, he says, 'in laying no previous restraint upon publications, and not in freedom from censure for criminal matter when published. Every free man has an undoubted right to lay what sentiments he pleases before the public; but if he publishes what is improper, mischievous, or illegal, he must take the consequence of his own temerity.' Volume 4, p. 151. And Mr. Justice Story, in his Commentaries on the Constitution, states that 'every free man has an undoubted right to lay what sentiments he pleases before the public; to forbid this is to destroy the freedom of the press.' Volume 2, sec. 1884 (4th Ed.).

"In Patterson v. Colorado, 205 U. S. 454, 462, 27 S. Ct. 556, 558, 51 L. Ed. 879, 10 Ann. Cas. 689 (1907), the court, speaking through Mr. Justice Holmes, declares that the main purpose of the constitutional provision as to free press is 'to prevent all such previous "restraints" upon publications as had been practiced by other governments,' and they do 'not prevent the subsequent punishment of such as may be deemed contrary to the public welfare.' Now clearly the Espionage Act imposes no restraint prior to publication, and no restraint afterwards, except as it restricts circulation through the mails. Liberty of circulating may be essential to freedom of the press, but liberty of circulating through the mails is not, so long as its transportation in any other way as merchandise is not forbidden.

"The Act of Congress now called in question does not undertake to say that certain matter shall not be published nor that it shall not be transmitted in interstate commerce. It simply declares that such matter shall not be carried in the United States mails. In Ex parte Jackson, 96 U. S. 727, 24 L. Ed. 877 (1877), the Supreme Court held that the power vested in Congress to establish post offices and post roads embraces the regulation of the entire postal system of the country, and that under it Congress can designate what may be carried in the mail and what excluded. In that case Mr. Justice Field, speaking for the court, said:

. " 'In excluding various articles from the mail, the object of Congress has not been to interfere with the freedom of the press, or with any other rights of the people, but to refuse its facilities for the distribution of matter deemed injurious to the public morals.' "

Consequently, assuming that the "Revolutionary Age" is a newspaper, the question raised here does not involve the freedom, but merely the convenience of the press.

▮ Furthermore, as the use of the mails is a privilege accorded by the government only on certain terms and only for purposes not prohibited by Congress, there is a broader aspect of the situation which must be borne in mind.

The relation which an individual chooses to occupy towards society, or the privileges offered by society of which he may wish to avail himself, may, during the continuance of that relationship, or whilst he is availing himself of those privileges, necessarily limit, or wholly suspend the exercise of some of his constitutional rights, which are pro hac vice waived.

That some constitutional rights are thus suspended even in many of the ordinary relations of life was pointed out long ago by Mr. Justice Holmes whilst he was still a Justice of the Supreme Judicial Court of Massachusetts in McAuliffe v. Mayor and Board of Aldermen of New Bedford (1892) 155 Mass. 216, 29 N. E. 517. Mr. Justice Holmes said in that case at page 219 of 155 Mass., 29 N. E. 517:

"This is a petition for mandamus to restore the petitioner to the office of policeman in New Bedford. He was removed by the mayor upon a written complaint, after a hearing, the mayor finding that he was guilty of violating Rule 31 of the police regulations of that city. The part of the rule which the petitioner seems certainly to have violated is as follows: 'No member of the department shall be allowed to solicit money or any aid, on any pretense, for any political purpose whatever.' There was also evidence that he had been a member of a political committee, which likewise was prohibited. Both parties agree that the city had accepted chapter 319 of the Acts of 1890, by virtue of section 1 of which the members of the police force held office 'during good behavior and until removed by the mayor, * * * for cause deemed by him sufficient, after due hearing.' It is argued by the petitioner that the mayor's finding did not warrant the removal, that the part of the rule violated was invalid as invading the petitioner's right to express his political opinions, and that a breach of it was not a cause sufficient under the statute.

"One answer to this argument, assuming that the statute does not make the mayor the final judge of what cause is sufficient, and that we have a right to consider it, (Ham v. Boston Board of Police, 142 Mass. 90, 95 [7 N. E. 540], and Osgood v. Nelson, L. R. 5 H. L. 636, 649) is that there is nothing in the Constitution or statute to prevent the city from attaching obedience to this rule as a

condition to the office of policeman, and making it part of the good conduct required. The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman. There are few employments for hire in which the servant does not agree to suspend his constitutional right of free speech, as well as of idleness, by the implied terms of his contract. The servant cannot complain, as he takes the employment on the terms which are offered him. On the same principle, the city may impose any reasonable condition upon holding offices within its control. This condition seems to us reasonable, if that be a question open to revision here."

So, in the present case, although freedom is guaranteed by the Constitution to the press, there is not any constitutional guaranty to the press, or to any one else, of a free use of the mails.

■ It follows from the considerations just mentioned that the plaintiffs here who ask for themselves the privilege of sending the "Revolutionary Age" through the mails must, as part of the price for that privilege, conform to the requirements of Congress as embodied in the Postal Laws and Regulations.

■ Second. The second preliminary question to be dealt with is the contention of the government that by reason of his previous record the plaintiff, Gitlow, cannot properly be heard to ask this court for the equitable relief here sought because he does not come into equity with clean hands. I do not think this doctrine is applicable to the present case.

An injunction is here sought against an exercise of post office police power. If the exercise of that power was clearly wrong, the plaintiff is entitled as of right to the relief which he seeks, irrespective of his previous history, or of his alleged predilections.

The relief sought is not discretionary and does not involve a balancing of equities. The analogy is rather to a criminal proceeding in which the crime set forth in the indictment is the sole basis of the inquiry.

The July 15th issue of the "Revolutionary Age" is the offending thing here, and the propriety of the exclusion order issued by the Post Office Department must be determined wholly from what is contained within the four corners of that publication.

■ III. The particular issue of the "Revolutionary Age" which is in question here is that of July 15, 1930. It contains a reprint of certain previous issues which on May 17, 1930, were excluded from the mails apparently without any legal steps being taken by its publishers to prevent such exclusion.

The issue in question here was submitted to the Post Office Department on July 3, 1930, and on July 16, 1930, was excluded from the mails as unmailable under sections 470, 472, of the Postal Laws and Regulations of 1924, which are identic with title 18, sections 334 and 344 of the United States Code.

The letter from the defendant Kiely advising the plaintiffs of the decision that this issue of the "Revolutionary Age" must be excluded from the mails is as follows:

"United States Post Office

"Office of the Postmaster

"New York, July 16, 1930

"Publishers of Revolutionary Age, Room 807, 37 East 28th Street, New York, New York

"Gentlemen: Referring to your letter of July 3, 1930 which was sent to the Solicitor of the Postoffice Department with a copy of the July 15th, 1930 issue of the 'Revolutionary Age' I have to inform you, in accordance with the advice of the Solicitor, that the July 15th, 1930 issue, Volume 1, No. 17 of 'Revolutionary Age' is unmailable under Sections 470, 472 of the Postal Laws and Regulations of 1924.

"Sincerely yours,

"John J. Kiely, Postmaster."

IV. The "Revolutionary Age" which is described in its heading as standing "For Communist Unity in the Revolutionary Class Struggle" is issued by the "Communist Party United States Majority Group."

Under the headline "Smash Ban on Revolutionary Age," there are the words in somewhat smaller type, "We Challenge Post Office by reprinting barred issue."

The July 15th issue of the "Revolutionary Age" contains inter alia the following statements: On page 1, column 1:

"The Post Office Department has never dared to invoke this law against the press during all this time. It has used this law for the first time against the Revolutionary Age. The particular sections of the law cited by the postal authorities against the Revolutionary Age are sections 334 and 344 and reads as follows: * * *

"The Revolutionary Age is a Communist newspaper. Its policy is one that is inseparable from the interests of the exploited masses in the United States, the millions of workers and poor farmers. It has never hidden the fact that it is unalterably opposed to

the present ruling class and that it is devoted to a determined fight for the over-throw of the anti-labor strike-breaking government of the United States."

On page 1, column 2: "If the Post Office Department refuses to mail this issue of our paper, we are determined to fight it out regardless of all consequences, because to capitulate and to accept the ruling of the Post Office Department gives the strike-breaking government of the United States a weapon with which to suppress every paper that has the courage to fight in the interests of the workers."

On page 1, column 3: "We will continue our fight against unemployment and for immediate adequate relief to the millions of unemployed. We will continue our fight against the open-shop, union-smashing wage cutting campaign of the employers. We will continue our fight against the strike-breaking activities of the government with its military police, with its judges and court injunctions against workers on strike."

On page 1, column 4: "We will continue our fight against American imperialism which at home drives the workers thru inhuman exploitation methods and abroad thru machine guns, battleships and bayonets in Latin-America, Asia, the Philippines, and subjugates the masses to its oppressive, bloody, tyrannical rule. We will continue our fight against world imperialism which is preparing the outbreak of a world war. We will continue our fight for the recognition of the Soviet Union and for its defense in the event of an attack by any imperialist powers. We are for transforming any imperialist war in which U. S. capitalist class engages into a civil war of toilers against the capitalists. We are for the organization of the workers in the United States, both politically and economically, to give in them the power to fight against their capitalist exploiters. We are for the development in the United States of a Communist Party that will win the support of the workers and will have the intelligence and the ability to not only lead these workers in their daily struggles but also in a revolutionary struggle against capitalism and for a workers government and Communism in the United States."

On page 1 at the end of column 4: "Fearing the growing discontent of the workers due to the economic crisis will be developed into conscious action against the capitalists, the United States government thru its Post Office Department, is therefore attempting to terrorize the workers movement by declaring that opposition to its rule is treason. To the capitalist government's charge of treason let every worker answer: 'Yes, we are traitors to the capitalist class which exploits us and oppresses and we will fight militantly to get rid of our capitalist masters.' "

On page 3 of this same issue of the "Revolutionary Age" under an article headed "Lenin" and signed "B. D. W.," apparently the initials of Bertram D. Wolfe, is the following in column 4: "Without all these conditions, discipline in a revolutionary Party, really capable of becoming a party of the advanced class whose object is to overthrow the bourgeoisie and revolutionize all of society, is impossible of realization. Without these conditions, all attempts to create discipline result in empty phrases, in tomfoolery, in clownishness."

On page 5, under the heading entitled "Lenin to the American Workers" is the following in column 2: "Its servants charge us with the use of terroristic methods * * * Have the English forgotten their 1649, the French their 1793? Terror was just and justified when it was employed by the bourgeoisie for its own purposes against feudal domination. But terror becomes criminal when workingmen and poverty stricken peasants dare to use it against the bourgeoisie. Terror was just and justified when it was used to put one exploiting minority in the place of another. But terror becomes horrible and criminal when it is used to abolish all exploiting minorities, when it is employed in the cause of the actual majority, in the cause of the proletariat, of the working class and the poor peasantry. * * * * "

On page 5, column 3, the following statement occurs: "We know that it may take a long time before help can come from you, comrades, American workingmen, for the development of the revolution in the different countries proceeds along various paths, with varying rapidity (how should it be otherwise?). * * * "

On page 5, column 4, there is the following statement: "We are in a beleaguered fortress, so long as no other international socialist revolution comes to our assistance with its armies. But these armies exist, they are stronger than ours, they grow, they strive, they become more invincible the longer imperialism with its brutalities continues. Workingmen the world over are breaking with their betrayers, with their Gompers and their Scheidemanns. Inevitably labor is approaching Communistic Bolshevistic tactics, is preparing for the proletarian revolution

that alone is capable of preserving culture and humanity from destruction. We are invincible! The Proletarian revolution is invincible!"

V. The statutes invoked by the Postmaster General as the method of excluding the "Revolutionary Age" must now be considered in order that it may be seen whether the words used and the statements made in that issue of the excluded publication are such as to make "clearly wrong" the decision of the Post Office Department to exclude it from the mails.

It should be noted first that the provisions of section 470 of the Postal Regulations, as above stated, are identic with those of section 334 of the United States Code, title 18. Section 334 is not correctly quoted on the front page of the "Revolutionary Age." The relevant parts of section 470 of the Postal Regulations are as follows:

"Section 470. Every obscene, lewd, or lascivious, and every filthy book, pamphlet, picture, paper, letter, writing, print, or other publication of an indecent character  *  *  * is hereby declared to be non-mailable matter and shall not be conveyed in the mails or delivered from any post office by any letter carrier. Whoever shall knowingly deposit, or cause to be deposited, for mailing or delivery, anything declared by this section to be non-mailable, or shall knowingly take, or cause the same to be taken, from the mails for the purpose of circulating or disposing thereof, shall be fined not more than $5,000, or imprisoned not more than five years, or both."

"The term 'indecent' within the intendment of this section shall include matter of a character tending to incite arson, murder, or assassination."

Section 472 of the Postal Regulations is identic with section 344 of the United States Code, title 18. It was correctly quoted in the excluded issue of the "Revolutionary Age" and reads as follows: "Every letter, writing, circular, postal card, picture, print, engraving, photograph, newspaper, pamphlet, book, or other publication, matter or thing, of any kind, containing any matter advocating or urging treason, insurrection, or forcible resistance to any law of the United States, is hereby declared to be non-mailable."

Title 18, U. S. Code, § 345 (18 USCA § 345), reads: "Whoever shall use or attempt to use the mails or Postal Service of the United States for the transmission of any matter declared by sections 343 and 344 of this title to be nonmailable, shall be fined not more than $5,000 or imprisoned not more than five years, or both. Any person violating any provision of said sections may be tried and punished either in the district in which the unlawful matter or publication was mailed, or to which it was carried by mail for delivery according to the direction thereon, or in which it was caused to be delivered by mail to the person to whom it was addressed."

The duties of the Postmaster General are defined by section 369 of title 5 of the United States Code (5 USCA § 369), inter. alia, as follows: "Ninth. To superintend generally the business of the department and execute all laws relative to the Postal Service."

Exercising his duty and his power to execute the postal laws, the Postmaster General reached the decision that the issue of the "Revolutionary Age" of July 15, 1930, falls within the excluding provisions of the statutes above quoted and the identic postal regulations.

If he was "clearly wrong" I must set this ruling aside, but if his decision of exclusion involved passing on a mixed question of law and fact, the presumption is so strong in favor of its being correct that it is not for me lightly to disturb it.

VI. The question to be decided in this case is thus put by the plaintiffs' counsel: "Can any reasonable man hold that any individual or group of individuals are urged to forcible action by the reading of this paper?" I think that the answer to that question must be in the affirmative.

From the above-quoted extracts taken from the issue of "Revolutionary Age" in question it will be observed that the words "fight," "militant," "revolution," and "war" are recurrent. In these words, which may fairly be said to be the dominant words or slogan, of the excluded publication, the idea of force is implicit.

In Murray's Oxford Dictionary are found the following definitions of these words: A fight means "a combat or battle. A hostile encounter or engagement between opposing forces. A combat between two persons or animals  *  *  *  suggesting primarily the notion of a brawl or unpremeditated encounter, or that of a pugilistic combat."

As an intransitive verb "to fight" means primarily "to contend in battle or single combat." As a transitive verb it means primarily "to combat, or to engage or to oppose in battle; to war against."

The word "revolution" is thus defined in connection with political or governmental matters: "A complete overthrow of the es-

tablished government in any country or state by those who were previously subject to it; a forcible substitution of a new ruler or form of government."

The word "revolutionary" as an adjective means: "Pertaining to or connected with, characterized by, or of the nature of, revolution." As a noun it means: "One who instigates or favors revolution; one who takes part in a revolution."

The word "war" is defined as a "hostile contention by means of armed forces, carried on between nations, states, or rulers, or between parties in the same nation or state; the employment of armed forces against a foreign power or against an opposing power in a state." Figuratively "war" is used poetically or rhetorically to indicate any kind of active hostility or contention between living beings, or a conflict between opposing forces or principles.

The word "militant" means primarily "engaged in warfare, warring."

Turning to the statutes invoked by the postmaster, it is found that the word "insurrection" means "the action of rising in arms or open resistance against established authority or governmental restraint; an armed rising; a revolt; an incipient or limited rebellion."

It is quite true that these words may have come to have secondary meanings, and, in the case of some of them, a not uncommon metaphorical use, but surely the Post Office Department cannot be held to be "clearly wrong" if it takes the words which the plaintiffs use in their primary meanings, especially as the context points to such meanings.

Mr. Justice Holmes in Towne v. Eisner, 245 U. S. 418, at page 425, 38 S. Ct. 158, 159, 62 L. Ed. 372, L. R. A. 1918D, 254, said: "But it is not necessarily true that income means the same thing in the Constitution and the Act. A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used. Lamar v. United States, 240 U. S. 60, 65, 36 S. Ct. 255, 60 L. Ed. 526."

Paraphrasing the question here involved, as put by the plaintiffs' counsel, it is: "Would a reasonable man be clearly wrong in holding that the living thought, within the coils of the language used by the plaintiffs, was advocacy of forcible action against our institutions by insurrection or otherwise as the opportunity might present itself?" Certainly such a decision would not be clearly wrong.

VII. In the case of Milwaukee Social Democratic Publishing Co. v. Burleson, 255 U. S. 407, at page 416, 41 S. Ct. 352, 355, 65 L. Ed. 704, Mr. Justice Clarke, writing the opinion of the court affirming a refusal of the court below to interfere with an order of the Postmaster General withdrawing from the "Milwaukee Leader" second-class mailing privileges, said: "The order simply withdrew from the relator the second-class privilege, but did not exclude its paper from other classes, as it might have done, and there was nothing in it to prevent reinstatement at any time. It was open to the relator to mend its ways, to publish a paper conforming to the law, and then to apply anew for the second-class mailing privilege. This it did not do, but for reasons not difficult to imagine, it preferred this futile litigation, undertaken upon the theory that a government competent to wage war against its foreign enemies was powerless against its insidious foes at home. Whatever injury the relator suffered was the result of its own choice."

It would have been simple for the plaintiffs to have avoided the exclusion of their publication from the mails by stating explicitly in the "Revolutionary Age" that they would seek their ends by constitutional methods and without force.

The Post Office Department, it seems to me, was fully justified in holding that the plaintiffs do not advocate constitutional methods for the achievement of their purposes. Consequently, it was quite within its authority, acting under the sections of the Postal Laws and Regulations above mentioned, when it ruled that it would not open to such advocacy of the destruction of our government, as is contained in the excluded publication, its nationwide channels of communication, which reach even the tiniest hamlets and the loneliest farmsteads in the land.

The appropriate orders may be presented for settlement on two days' notice.