## NEW YORK LIFE INS. CO. v. BENNION.

### No. 3308.

Circuit Court of Appeals, Tenth Circuit.

Nov. 6, 1946.

Rehearing Denied Dec. 28, 1946.

HUXMAN, Circuit Judge, dissenting.

———◆———

Edwin Borchard, of New York City (George A. Critchlow and Walter M. Critchlow, both of Salt Lake City, Utah, Ferdinand H. Pease and Ronald Swinford, both of New York City, on the brief), for appellant.

Shirley P. Jones, of Salt Lake City, Utah, for appellee.

Before HUXMAN and MURRAH, Circuit Judges, and BROADDUS, District Judge.

MURRAH, Circuit Judge.

The New York Life Insurance Company issued its policy of insurance to Captain Mervyn S. Bennion, providing for double indemnity for accidental death, but specifically excluding from its coverage, death resulting from "war or any act incident thereto." The policy is a Virginia contract, executed May 23, 1925. On account of the insured's occupation as a naval officer, an extra premium, equal to the normal charge for double indemnity benefits, was included in the total premium.

When the Japanese attacked Pearl Harbor on the morning of December 7, 1941, Captain Bennion was in command of the Battleship West Virginia, at that time lying at anchor in the Harbor. While at his post of duty repelling the attack, he was killed soon after its commencement by a fragment of a Japanese bomb or shrapnel. The Company paid the face amount of the policy, but denied liability for double indemnity on the grounds that death resulted from war or an act incident thereto within the meaning of the policy. The trial court granted recovery, and the Company has appealed.

According to official reports,[1] 250 or 300 Japanese bombing and torpedo planes took part in the attack, resulting in 3,435 American casualties; severe damage to or loss of 8 battleships, 3 light cruisers, 3 destroyers, 3 miscellaneous vessels, and 188 planes, as well as damage to land-based military installations. Japan suffered something less than 100 casualties, the loss of 29 planes, and 5 midget submarines. The event was one of the greatest military and naval disasters in our nation's history. When the attack was launched, we were not only at peace with Japan, but were actually engaged in a peace conference with her envoys. It was deliberately and strategically planned, and while recognized as a possibility in view of our strained relations, came as a complete surprise to our civil, military and naval authorities.

About one hour after the commencement of the attack (7:30 a. m. Honolulu time, 1:30 p. m. Washington time), the Japanese envoys in Washington delivered a note to our State Department informing our Government of the severance of diplomatic relations. The delivery of the note was intended to coincide with the attack as a part of Japan's prearranged war strategy. About three hours after the commencement of the attack, and while it was in progress, the Japanese Imperial Headquarters announced that war began as of "dawn" that date, meaning 7:30 a. m. Honolulu time. About eight hours still later (3:00 p. m. Honolulu time, 9:00 p. m. Washington time), the United States Embassy at Tokyo received a communication from the Japanese Foreign Minister, informing our Government that a state of war had arisen between the two countries "beginning today". President Roosevelt

---

[1] The Roberts Report, Senate Document 159, 77th Congress, 2nd Session. Joint Committee on Investigation of the

Pearl Harbor Attack, Congress of the United States, Senate Document 244, 79th Congress, 2nd Session.

appeared before a joint session of Congress on the following day, December 8th, to request that Congress declare the existence of a state of war between the United States and the Japanese Empire. The Congress was informed that "Yesterday, December 7, 1941 * * * the United States of America was suddenly and deliberately attacked by naval and air forces of the Empire of Japan". After detailing the course of events of the preceding day, the President asked the Congress to declare that "since the unprovoked and dastardly attack by Japan on Sunday, December 7th, a state of war has existed between the United States and the Japanese Empire." (See House Document 453, 77th Congress, 1st Session). The Congress responded by joint resolution "that the state of war between the United States and the Imperial Government of Japan which has thus been thrust upon the United States is hereby formally declared. * * *" The resolution was approved by the President and became effective December 8, 1941, at 4:10 p. m., Washington time. 55 Stat. 795, 50 U.S.C.A.Appendix, note preceding section 1.

No one denies the grim reality that the attack beginning December 7, 1941, at about 7:30 a. m. Honolulu time, marked the commencement of an armed conflict between two sovereign nations which ended only when the Japanese surrendered nearly four years later. Furthermore, it seems to be agreed that the existence or non-existence of a state of war is a political question, to be determined by the political department of our Government. The basic difference lies in the contention on the one hand that a formal declaration by the Congress, which alone has the constitutional power to declare and make war, is an essential prerequisite to judicial cognizance of its existence; and the contention on the other hand that the existence of a war is not dependent upon its formal declaration, but rather is determinable from an appraisal of actualities; that the formal declaration by Congress on the day after the attack was merely a formal recognition of that which was already actually in existence. Both contentions find very respectable support in the adjudicated cases. Since the contract was made in Virginia, its construction and effect are of course governed by Virginia law. But the Virginia courts have not spoken, and we therefore have the duty to determine what we conceive will be the law of Virginia when its courts do speak on the subject.

All of the cases which support the appellee involve the death of an insured resulting from the Pearl Harbor attack under contracts of insurance, containing either identical or similar words of exclusion as those under consideration here. They are bottomed on the concept that courts may not take judicial notice of the existence of a war until it is formally and officially declared by the Congress of the United States; that the parties contracted in contemplation of this rule of law and are bound by it. A valid distinction is drawn between an act of war and a state of war, and the attack of December 7th is characterized as an act of war, which did, but not necessarily, eventuate in a state of war. The Panay Incident on the Yangtze River in China is suggested as a comparable act of war which did not eventuate in a state of war. Then too, it is said, in accordance with the universal rule, that if the words used to express the intention of the parties in the contract are ambiguous or susceptible of two meanings, one of which will permit recovery and the other will not, it should be given a construction most favorable to the insured. West v. Palmetto State Life Ins. Co., 202 S.C. 422, 25 S.E.2d 475, 145 A.L.R. 1461; Rosenau v. Idaho Mutual Benefit Ass'n, 65 Idaho 408, 145 P.2d 227; Savage v. Sun Life Assur. Co. of Canada, D.C., 57 F.Supp. 620; Gladys Ching Pang v. Sun Life Assur. Co., Supreme Court of the Territory of Hawaii, October Term, 1945.

The last cited case from the Territory of Hawaii calls attention to the joint resolution of Congress, approved December 8th, formally declaring war, and points to what it considers the significance of the failure of the Congress to comply with the President's request to declare that a state of war had existed since the "unprovoked and dastardly attack by Japan on Sunday, December 7th." To show that

the Congress could have, but did not recognize the existence of a state of war on December 7th, the court emphasized the difference between this resolution and the joint resolution of Congress formally declaring war on Spain on April 25, 1898, in which war was specifically declared to exist, and had existed since the 21st day of April, 1898. The court also cites and quotes from a treatise by Manley O. Hudson, 39 Harv.Law Review 1020, to the effect that for the purpose of municipal law, a state of war between the United States and Germany did not exist until its formal declaration by joint resolution of Congress on April 6, 1917, 40 Stat. 1, although the Congress was "perhaps competent" to give the declaration a retroactive effect in view of the many previous acts of war committed by Germany against the United States. This argument, of course, assumes the premise that the courts may not take notice of the existence of a state of war until it is formally declared by the Congress.

The authorities which support the contentions of the appellant also involve insurance contracts which are identical or similar to ours. Vanderbilt v. Travelers' Ins. Co., 112 Misc. 248, 184 N.Y.S. 54, 55, involved an insurance contract excluding from its coverage "death * * * resulting, directly or indirectly, wholly or partly, from * * * war or riot." The insured lost his life when a German submarine sank the British steamer Lusitania, on which he was a passenger. At that time a state of war existed between Germany and Great Britain, but not between Germany and the United States. The court rejected the contention that the United States must have been at war with Germany in order to come within the language of the policy, holding that " 'war' is every contention by force between two nations under the authority of their respective governments."

Stankus v. New York Life Ins. Co., 312 Mass. 366, 44 N.E.2d 687, involved an insurance contract also issued by this appellant, containing identical words of exclusion. The insured, a seaman in the United States Navy, lost his life when the USS Ruben James was torpedoed by German submarines on October 30, 1941. At that time, Germany was at war with Great Britain, but at peace with the United States. In holding that the insured's death resulted from war or an act incident thereto, the court reasoned that the existence of a war was not dependent upon its formal declaration, but that any conflict between the armed forces of two nations under authority of their respective governments was commonly regarded as war. The attack on Pearl Harbor was cited as the latest illustration of war without formal declaration. Referring to the insurance contract, the court noted that the term war, as used therein, was not limited or restricted by anything appearing in the policy; that it referred to no particular type or kind of war, but applied in general to every situation that ordinary people would commonly regard as war, and should be so construed and enforced. In support of its definition of war, the Massachusetts court cited Bas v. Tingy, 4 Dall. 36, 37, 1 L.Ed. 731; The Prize Cases (The Amy Warwick), 2 Black 635, 17 L.Ed. 459; Montoya v. United States, 180 U.S. 261, 21 S.Ct. 358, 45 L.Ed. 521; Oetjen v. Central Leather Co., 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726; Hamilton v. McClaughry, 8 Cir., 136 F. 445; Gitlow v. Kiely, 2 Cir., 44 F.2d 227.

In the Prize cases, supra, after the outbreak in hostilities between the States, President Lincoln, on April 19 and 27, 1861, issued an executive proclamation establishing a blockade of all Southern ports, and ordered the capture of all vessels violating the blockade. In pursuance of the proclamation, certain vessels belonging to foreign countries were captured and held as prizes of war. Congress was in recess at the time and had not acted upon the insurrection, and the question arose whether the vessels thus captured and held were war prizes under either municipal or international law. It was argued with great force and eloquence that since Congress alone was empowered to declare war, there could be no war cognizable in the courts without and until a legislative declaration thereof; that only the Congress could interrupt the otherwise peaceful commerce between friendly nations. In holding that

the vessels seized under the executive proclamation were war prizes, the court recognized that Congress alone had the constitutional power to formally declare a national or foreign war, but it also affirmed the power of the President, as Commander and Chief of the army and navy, to use the military and naval forces of the United States in case of invasion by a foreign nation. Said the court, "If a war be made by invasion of a foreign nation, the President is not only authorized but bound to resist force, by force. He does not initiate the war, but is bound to accept the challenge without waiting for any special legislative authority. And whether the hostile party be a foreign invader, or States organized in rebellion, it is none the less a war, although the declaration of it be 'unilateral' ". The court called attention to the historical fact that the battles of Palo Alto and Resaca de la Palma had been fought before the passage of the act of Congress declaring war on Mexico on May 13, 1846, which recognized "a state of war as existing by the Act of the Republic of Mexico." 9 Stat. 9. And speaking of the commencement of the Civil War, the court used language which has singular application to our situation. "However long may have been its previous conception, it nevertheless sprung forth suddenly from the parent brain, a Minerva in the full panoply of war. The President was bound to meet it in the shape it presented itself, without waiting for Congress to baptize it with a name; and no name given to it by him or them could change the fact." And speaking of the province of the courts in a situation of this kind, the court said, "They cannot ask a court to affect a technical ignorance of the existence of a war, which all the world acknowledges to be the greatest civil war known in the history of the human race * * *." Thus, the court left no doubt that the executive proclamation was a political determination of a state of war, of which the courts were bound to take judicial cognizance.

■ When one sovereign nation attacks another with premeditated and deliberate intent to wage war against it, and that nation resists the attacks with all the force at its command, we have war in the grim sense of reality. It is war in the only sense that men know and understand it. Mankind goes no further in his definitive search—he does not stand on ceremony or wait for technical niceties. To say that courts must shut their eyes to realities and wait for formalities, is to cut off the power to reason with concrete facts. We cannot believe that the courts are deprived of the power to deal with this vital question in a practical and realistic sense.

■ Let us suppose that Congress was not in session on December 7th when the Japanese attacked, and could not convene for thirty days, therefore could not and did not formally declare or recognize a state of war until January 8, 1942. Meanwhile, the President, acting in his capacity as Commander and Chief of the armed forces, took all available measures, not only to repel the invasion, but waged, as we did, an offensive war at Midway and throughout the Pacific. And let us suppose that the insured here had been killed on January 7, 1942, in one of the many sea battles which raged over the Pacific immediately after the Pearl Harbor attack. In these circumstances, it cannot be denied that the acts and conduct of the President, acting in furtherance of his constitutional authority and duty, would constitute a political determination of a state of war of which the courts would take judicial notice. We can discern no demonstrable difference in the supposition and the actual facts, and we therefore conclude that the formal declaration by the Congress on December 8th was not an essential prerequisite to a political determination of the existence of a state of war commencing with the attack on Pearl Harbor.

■ But the actual existence of a state of war and the political determination of its commencement with the attack on December 7th is immaterial to this lawsuit if the word war, as used in the contract, was intended by the parties to mean a state of war which commenced only with a formal declaration by Congress on December 8th. In construing and interpreting the contract between the parties, it is our func-

tion and duty to ascertain and effectuate their lawful intention. In so doing, we should place ourselves in the position of the parties when the contract was made, consider the purposes, the subject matter, and the circumstances under which their minds met. New York Casualty Co. v. Sinclair Refining Co., 10 Cir., 108 F.2d 65; Cocke v. Vacuum Oil Co., 5 Cir., 63 F.2d 406; Western Commercial Travelers' Ass'n v. Smith, 8 Cir., 85 F. 401, 40 L. R.A. 653; Restatement of Contracts, Sec. 226 & 236.

■ The subject matter of the contract was a risk assumed on the life of the insured by the Company, for a stipulated premium, and the use of the word war was obviously intended to denote a restriction or limitation upon the risk assumed. It is plain, therefore, that the definition given to the word war bears a direct relationship to the risk assumed, which is the subject matter of the contract. Viewed in this light, it is also plain that when the parties used the word war, they had in mind the hazard to human life incident thereto. Virginia courts adhere to the general rule that, as in other contracts, words used in insurance contracts to express the intent of the parties are to be construed in their plain, ordinary and popular sense, unless it is evident from the general scope and purpose of the contract that the words were intended to have some other special meaning. United States Mutual Accident Ass'n v. Newman, 84 Va. 52, 3 S.E. 805; Darden v. North American Ben. Ass'n, 170 Va. 479, 197 S.E. 413; Cooley Briefs on Ins., Vol. 2, p. 1004; Restatement of Contracts, Sec. 235; 29 Amer.Juris., Sec. 159, p. 175. Furthermore, the language used in the contract to express the intention of the parties is that of the Company, and it is only consistent with reason and justice that if a critical word or phrase in the policy is susceptible of more than one meaning, one of which permits recovery and the other does not, it should be given the construction most favorable to the insured. United States Mutual Accident Ass'n v. Newman, supra; Marandino v. Lawyers' Title Ins. Corp., 156 Va. 696,

159 S.E. 181; Stroehmann v. Mutual Life Ins. Co. of New York, 300 U.S. 435, 57 S.Ct. 607, 81 L.Ed. 732; Bergholm v. Peoria Life Ins. Co., 284 U.S 489, 52 S.Ct. 230, 76 L.Ed. 416.

■ But we can find nothing in the subject matter, the context, or the purpose of this contract to indicate that the parties intended to use the word war in the technical sense of a formally declared war. The parties did not specify any particular type or kind of war, rather they used the all inclusive term, and we think it only fair to assume that they had in mind any type or kind of war in which the hazard of human life was involved. In short, we think the parties contracted with reference to a "shooting war". It follows therefore that the insured's death resulted from war or an act incident thereto within the meaning and purpose of the insurance policy.

■ Finally, it is argued that the Company is precluded from contesting its liability under the policy by virtue of Section 4228a, Virginia Code 1924, which pertinently provides that an insurance policy shall not be contestable for any cause after one year from the date of its issuance "except for non-payment of premiums, or the violation of the conditions of such policy requiring the payment of additional premium in the event of naval or military service in time of war; * * *." This statute necessarily enters into and becomes a part of every insurance contract written in the State of Virginia. On this basis, it is contended that since the provision covers and includes military service, within the limits of the risk assumed, the policy cannot be contested, because death resulted from military service unless the insured violated the conditions requiring the payment of additional premium.

■ But the Virginia courts have held that this statute relates to the validity of the contract, and does not deny the Company the right to controvert the amount of its liability, or to "contend that the risk involved was not assumed in the coverage." Darden v. North American Ben. Ass'n, 170 Va. 479, 197 S.E. 413, 415. See

also New England Mutual Life Ins. Co. v. Mitchell, 4 Cir., 118 F.2d 414, construing the same statute. Statutes of similar import have received a like construction by other states. See Metropolitan Life Ins. Co. v. Conway, 252 N.Y. 449, 169 N.E. 642; Equitable Life Assur. Society v. First National Bank, 5 Cir., 113 F.2d 272, 135 A.L.R. 439; Head v. New York Life Ins. Co., 10 Cir., 43 F.2d 517. The statute did not preclude a denial of coverage as in this case.

The judgment is reversed.

HUXMAN, Circuit Judge (dissenting).

In my judgment, the decision of the lower court should be affirmed. In Gladys Ching Pang v. Sun Life Assur. Co. of Canada, decided at the October, 1945 term of the Supreme Court of the Territory of Hawaii, the court concluded that the attack on Pearl Harbor on December 7, 1941, did not constitute war so as to relieve an insurance company of liability under a similar exclusion clause. This is a well reasoned, exhaustive opinion, and I agree with its reasoning. The gist of this opinion is adopted for the purpose of this dissent. In addition to what is said in that case, I desire to make the following observations.

It is, of course, recognized without exception that where ambiguity exists in words or terms of an insurance contract, such ambiguity is most strongly construed against the insurance company and in favor of the insured. It is equally well recognized that a court may not and should not create an imaginary ambiguity in order to construe a contract against the company.

If the word "war" has but one meaning and is susceptible of exact definition so that the minds of reasonably intelligent men cannot differ as to its meaning, there is no occasion for the construction of the contract. It must, then, be given the one meaning which it has to men of such intelligence. But if, on the other hand, it has different meanings, or if what is war may have different meanings when considered in different settings, then there is ambiguity in the use of these terms in the contract, unless the sense in which they are used is clearly set out and defined.

"War" is a word of many meanings. It cannot be said that it has but a single meaning. Neither does what constitutes war between nations mean the same things at all times. So there are acts of war, or acts of aggression, which, while they may lead to war, do not constitute war themselves. So, also, there is war in the legal sense, and in the material sense. Legal war exists when there is an interruption of all pacific relations between nations and an authorized contestation of armed forces by the constitutional authority of the nations, while material war is evidenced by the use of armed forces by the parties. It is said that war "is not a mere contest of force, but must be an armed struggle carried on between two political bodies each of which exercises de facto authority over persons within a determinate territory, and its existence is determined by the authorized political department of the government."[1]

In a legal sense, we are not and cannot be at war with another nation until Congress has declared war, either by a formal declaration of war or by an Act of Congress evidencing its consent to the waging of war, such as providing for the raising and equipping of armed forces, and authorizing the President to use them in combat with an aggressor nation. An act of aggression, whether large or small, by another nation, does not create a state of war until we accept the challenge in a way provided for under our Constitution. The President has power to resist acts of aggression, but he is powerless to declare war, go to war, or put us into war without the formal action of Congress expressed by some form of statutory enactment.

If we were at war with Japan during the attack on Pearl Harbor on December 7, we were likewise at war with Japan during the bombing of the Panay. The Panay incident is sought to be distinguished on the ground that it was unintentional on

---

[1] See 67 C.J., Sec. 1, on War.

Japan's part, and the result of an accident. That was the explanation Japan gave, and we chose to accept it, because we did not at 'that time want to go to war. There is no doubt now that the Panay incident was deliberate, and I doubt if our government officials misunderstood it at the time. If the Pearl Harbor incident constituted war, then we were at war with Mexico when our fleet bombarded Vera Cruz, and we were at war with Mexico when our armed forces invaded Mexico in pursuit of Villa. Certainly the attack on Vera Cruz was just as deliberate as the attack on Pearl Harbor. There was no accident or misunderstanding in that attack. The gunfire from our warships was deliberately and intentionally directed against the property of a sovereign nation, and killed Mexican citizens and destroyed Mexican property. Everyone knows that for a number of years, even before we went to war with Japan, the Japanese and Russian forces in Manchuria made numerous attacks on each other, some lasting for days. Yet both nations chose to ignore them and refused to go to war. During all this time they maintained their diplomatic relations and carried on their ordinary peace-time activities. It will be recalled that for a long time after we were at war with Japan, we urged Russia to sever diplomatic relations with Japan and go to war against her, but that Russia refused, and declared war and went to war against Japan only during the closing months of the war. Certainly, all of these acts of war which the Russian and Japanese forces committed against each other were deliberate and intentional. It cannot, however, he contended seriously that Russia and Japan were at war during the time of each of these incidents, extending over a number of years, but were then immediately at peace again when the incident was over, and were at war again when the next incident occurred, because during all of this time they continued their diplomatic relations and considered themselves to be at peace. These illustrations could be multiplied manyfold, but they suffice to show the distinction and difference between acts of aggression, which may or may not lead to war, and

war itself. The only difference between the Pearl Harbor incident and the Panay and Vera Cruz incidents is one of degree. Those incidents did not lead to war. While the incident at Pearl Harbor did lead to war, it was legally possible to avoid war, and war did not come until it was declared.

Neither is the risk assumed for loss from acts of aggression between the armed forces of nations as great as loss from war. An act of aggression or an act of war may be a single incident or a limited number of incidents. Acts of aggression also cover a shorter period of time and are not waged with the same intensity as battles in war. As a result, an insurance company might well be willing to assume such risks, but not be willing to assume the enormous loss resulting from a legally declared war.

It seems to me that the word "war" and what constitutes war is susceptible of different meanings and incapable of exact definition. It follows that the sense in which these terms are used in the exclusion clause is ambiguous. While it may not be of legal significance, it is worthy of note on the question whether there is uncertainty in the mind of the company as to the ambiguity in the terms of the exclusion clause, that in another policy which we had occasion to consider in New York Life Ins. Co. v. Cooper, 10 Cir., 158 F. 2d 257, the language employed was entirely different. The language in that policy excluded loss from death resulting " * * * from military or naval service in time of war; from a state of war, or insurrection." This language is certainly broader than the language in the policy in question here, and does not have the same meaning.

When ambiguity once exists, our duty under the well recognized rule of construction is clear. We do not gaze into a crystal ball to try to place ourselves in the position of the parties at the time of the execution of the contract in order to attune our minds to theirs, to try and think their thoughts as to how they would consider such a subsequent act as Pearl Harbor. The rule is clear that in such a case, we adopt the meaning most beneficial to the insured, and construe the contract most

favorably to him. So construed, the ruling should be that the policy excludes loss from death resulting from war, meaning a legal war, but covers loss for death resulting from acts of aggression, whether they did or did not subsequently lead to war.

For the above reasons, I respectfully dissent.

