## LOWENSTEIN v. FIDELITY & CASUALTY CO. OF NEW YORK.

(Circuit Court, W. D. Missouri, W. D. June 13, 1898.)

No. 2,223.

1. ACCIDENT INSURANCE—CONSTRUCTION OF POLICY—INVOLUNTARY ASPHYXIATION.

A clause declaring that the insurance does not cover injuries or death "resulting from poison or anything accidentally or otherwise taken, administered, absorbed, or inhaled," does not exempt the insurer from liability for death caused by involuntary and unconscious inhalation of illuminating gas, accidentally taken while asleep.

2. SAME.

The word "inhaled," as used in the above provision of the policy, means a voluntary and intelligent act by the insured, and not an involuntary and unconscious inhalation.

3. SAME.

The words "or otherwise," as used in the above provision, do not qualify the act of inhaling, but are used in connection with the preceding word, "accidentally," and mean an injury of a kindred character.

4. SAME.

Policies of insurance are to be liberally construed, and the conditions therein are to be construed strictly against those for whose benefit they are reserved. And any doubt or ambiguity as to the meaning of any clause in a policy should be resolved in favor of the insured, and against the insurer.

5. SAME.

An insurance company, continuing to issue, without change, policies containing clauses which have been construed unfavorably to its contention

by the highest court of the state in which the company is incorporated, may well be considered as issuing them with that construction placed upon them.

I. J. Ringolsky, for plaintiff.

Warner, Dean, Gibson & McLeod and D'Laguer Berier, for defendant.

PHILIPS, District Judge.    This is an action brought to recover on an accident policy issued by the defendant, a New York corporation, to Emanuel Lowenstein, payable to his wife, the plaintiff, in case of death.    On a trial to a jury, the jury have found that the assured died from asphyxiation caused by the involuntary and unconscious inhalation of illuminating gas, accidentally taken, in his bedroom, in the city of New York, while the assured was asleep. The defendant has filed a motion in arrest of judgment, which raises the question whether or not the defendant is exempt from liability for such accident by reason of the following provision of the policy:   "This insurance does not cover injuries, fatal or otherwise, resulting from poison or anything accidentally or otherwise taken, administered, absorbed, or inhaled."    The court of appeals of New York, from which state this defendant received its charter, in Paul v. Insurance Co., 112 N. Y. 472, 20 N. E. 347, held that a provision in an accident insurance policy that the insurance should not extend to a death caused by the taking of poison or inhaling of gas did not apply to the instance of an involuntary and unconscious inhalation.    This conclusion is reasoned out by consideration of the whole context, indicating that the term "inhaling," as employed in the policy, could only be understood to mean "a voluntary and intelligent act by the insured, and not an involuntary and unconscious act."    The court further said:

"Read in that sense, and in the light of the context, these words must be interpreted as having reference to medical or surgical treatment,—in which, ex vi termini, would be included the dentist's work,—or to a suicidal purpose. To inhale gas requires an act of volition on the person's part before the danger is incurred.   Poison may be taken by mistake, or poisonous substances may be inadvertently touched; but, whatever the motive of the insured, his acts preceded either fact. * * * If the exception is to cover all cases where death is caused by the presence of gas, there would be no reason for using the word 'inhaled.'"

This decision was made in 1889.

This question, in its practical effect, came before Judge Blodgett, in the United States circuit court for the Northern district of Illinois, in 1891 (Richardson v. Insurance Co., 46 Fed. 843), in which the ruling of Paul v. Insurance Co., supra, was disapproved; the court adhering to the literal significance of the word "inhale," as implying only the physical act of drawing or breathing into the lungs, which would occur whether the person was conscious or unconscious of the operation.    This conclusion the court sought to fortify by the suggestion that the clause in question was doubtless adopted by the insurance company because of the practical difficulty, in most cases of death resulting from the inhalation of gas, to determine whether the death was occasioned by suicidal intent,

or whether it occurred accidentally. To the suggestion respecting the purpose of the insurance company, consideration will hereinafter be given.

The case of Early v. Insurance Co. (Mich.) 71 N. W. 500, cited by defendant's counsel, is hardly germane to the question under consideration. The policy exempted the insurance company from liability for injuries or death "by poison." Death ensued from the insured taking, by mistake, aqua ammonia, a poisonous drug. The court held that the expression "death by poison" covered an accidental death caused by poison, under whatever circumstances or conditions taken, and in that respect is differentiated from the New York cases, which contained the words "by the taking of poison." And the court calls attention to the language of the court in the Paul Case, that:

"If the policy had said that it was not to extend to any death caused wholly or in part by gas, it would have expressed precisely what the appellant now says it meant by the present phrase, and there could have been no room for doubt or mistake."

So it was properly held by the Michigan court that "death by poison" included any and every manner of poison, whether intentionally or unintentionally, consciously or unconsciously, taken.

Again this question came before the court of appeals of New York in Bacon v. Accident Ass'n, 123 N. Y. 304, 25 N. E. 399, in which the ruling in the Paul Case was reaffirmed; the court observing:

"Upon the question decided, the case is conclusive, and we have no disposition to alter our views as expressed therein."

The supreme court of Illinois passed upon a kindred question in Insurance Co. v. Dunlap, 160 Ill. 642, 43 N. E. 765, in which the court held that drinking carbolic acid by mistake for peppermint was not within a clause of an accident insurance exempting the company from liability for death from taking poison, as such words mean—

"The voluntary, intentional taking of poison, and do not include cases of accidental poison by mistake, but do include injuries or death from voluntarily taking poison without any suicidal intent."

The court referred to and approved the ruling of the New York court in the Paul Case.

The question came before the supreme court of Pennsylvania in Pickett v. Insurance Co., 144 Pa. St. 79, 22 Atl. 871, on a policy which exempted the company from liability for death resulting from the inhalation of gas. The insured descended into a well to make repairs on a pump, and died from asphyxia caused by poisonous gas at the bottom of the well. The court held that the inhalation of gas contemplated a voluntary, intelligent act, and not an involuntary and unconscious act; approving the ruling in the Paul Case.

The accident insurance companies were dissatisfied with the ruling in the Paul Case, and as late as March, 1896, the question was resubmitted to the New York court of appeals in Menneiley v.

Assurance Corp. 148 N. Y. 596, 43 N. E. 54. The ruling in the Paul Case was reaffirmed, with additional reasons in reply to the criticisms of counsel. Inter alia, the court said:

"The provision in the policy clearly implies voluntary action on the part of the insured or some other person. The insured must take or inhale, or another must administer. The manifest purpose of the provision is to exempt the insurer from liability where the insured has voluntarily and consciously, but accidentally, taken or inhaled, or something has been voluntarily administered which was injurious or destructive of life. We think that the particular accidents intended to be excepted by that provision are the accidental taking or inhaling into the system of some injurious or destructive agency under the mistaken belief that it was beneficial, or at least harmless. This is made more apparent by that portion of the provision which relates to something 'administered,' as it cannot be reasonably construed as referring to a thing involuntarily and unconsciously administered. Indeed, it is quite difficult to understand how a thing could be involuntarily and unconsciously administered. Coupled together as these provisions are, the same rule of construction must be applied to that portion which relates to something accidentally inhaled as is applied to the portion which relates to a substance accidentally taken or accidentally administered. All the cases thus provided for plainly involve voluntary and conscious action on the part of the insured or some other person. The leading and controlling idea in this provision is the performance of a voluntary act which accidentally causes the death or injury of the insured. That a proper construction of the policy requires us to hold that it applies only to cases where something has been voluntarily and intentionally, although mistakenly, taken, there can, we think, be but little doubt. * * * The argument that the provision as to inhaling gas has been given the same effect as is now given to the other and more general one, and that such could not have been their purpose, has little force. The inhaling of gas having been specially provided for when taken for surgical and like purposes, it is only when it is inhaled for some other purpose, or under other circumstances, that the general provision applies. The special provision is applicable when gas is inhaled for surgical and like purposes. The general provision applies when it is inhaled for other purposes."

At the May term, 1896, of the supreme court of Illinois, this question was taken to that court by this defendant, the Fidelity & Casualty Company of New York, in the Waterman Case, 161 Ill. 632, 44 N. E. 283, under a policy containing the same provisions, in the same language, as the one under consideration; and the supreme court reaffirmed the ruling in Insurance Co. v. Dunlap, Bacon v. Accident Ass'n, Pickett v. Insurance Co., and the New York cases, supra. There, as in the case at bar, counsel for the insurance company placed much stress upon the word "otherwise," employed in the provision that "this insurance does not cover injuries resulting from poison or anything accidentally or otherwise taken, administered, absorbed, or inhaled." It was there contended that these words included every possible way by which gas could be taken into the human system so as to cause death. The court said:

"Read in the light of the decisions, the words now in question do not mean otherwise than if they explicitly read, 'poison or anything accidentally or otherwise, consciously and by an act of volition, drawn into the system by inspiration.' "

I may add that the addition of the words "or otherwise" cannot by any technical or natural construction qualify the act of inhal-

ing. " 'Or otherwise,' in law, when used as a general phrase following an enumeration of particulars, is commonly interpreted in a restricted sense, as referring to such other matters as are kindred to the clause before mentioned." Cent. Law Dict. It is to be read in connection with the preceding word, "accidental," and means an injury of a kindred character, and would cover an intentional taking as well as an accidental taking. The court of appeals of Kentucky has recently followed the Paul Case, in Omberg v. Association, 40 S. W. 209.

It is to be conceded to the learned counsel for defendant that, looking alone to the etymology of the word "inhale," and to its ordinary, dictionary definition, it means to draw in, as air into the lungs, and to inspire, as to inhale air,—a process of life that goes on whether sleeping or waking; and in such sense it may be said that a person, when sleeping, breathes the air without any volition or intelligent action. But, as was said by Welsford:

"Etymology has been so unsuccessful in establishing clear and definite principles, or so unfortunate in their application, that many persons regard it is bearing the same relation to grammar as astrology does to astronomy, alchemy to chemistry, or perpetual motion to mechanics."

As applied to the practical business affairs of life, these primary meanings of words do not always afford safe rules of interpretation and application. This is especially so in the construction of restrictive provisions in insurance contracts, placed there by the insurer. The courts read them in connection with all the other provisions of the policy, in pari materia, and give them a construction in harmony with other kindred terms, so as to afford the largest measure of protection, according to the understanding of the terms employed, to the assured. And this leads to the consideration of the history of the controversy over the meaning of like provisions in insurance contracts, and the conduct of this defendant in continuing the employment of this phraseology in its policy, as affecting the conclusion which I have reached. In the Paul Case the court used this significant language:

"If the policy had said that it was not to extend to any death caused wholly or in part by gas, it would have expressed precisely what the appellant now says it meant by the present phrase, and there could have been no room for doubt or mistake. Policies of insurance are to be liberally construed, and, as in all contracts, conditions are to be construed strictly against those for whose benefit they are reserved. It is an accepted canon of interpretation that, if there is any uncertainty as to whether given words were used in an enlarged or restricted sense, the construction should be adopted which is the most beneficial to the covenantee."

As very pertinently observed by the supreme court of Illinois in Casualty Co. v. Waterman, 161 Ill. 636, 44 N. E. 284:

"Appellant is a New York corporation, and made and dated its contract in the city of New York; and this was done several years after the decision in the Paul Case by the court of last resort in that state. It must be presumed that it was then fully advised of that decision, and knew when it entered into the contract now in suit what its liabilities were, and the agreement that it made."

Notwithstanding the decisive reiteration by the court of appeals of New York of its construction of the term "inhaling," made as late as March, 1896, and notwithstanding the ruling of the supreme court of Illinois against this company in the Waterman Case, it has continued to issue its policies, and made the renewal in the case at bar, according to the verdict of the jury, as late as January, 1897, with the same provisions, in the same words as theretofore employed by it.    Under such circumstances, any taker of its policy would have been justified in taking it with the understanding that this New York corporation was issuing its policy with the construction placed upon it by the highest court of the state granting its charter.    If it was the purpose of the company as suggested by its counsel in argument at the bar, in inserting the word "otherwise," to avoid the effect of the ruling in the Paul Case, it is a sufficient answer to say that the court in that case suggested to the company the apt and direct words which would accomplish that end, whereas, if it employed the words "or otherwise" for such purpose, it was a concealed purpose, not apparent to the ordinary mind, and not at all calculated to carry to the insured, like Lowenstein, even a suggestion that it was intended to say by the policy that the company would not answer for liability resulting from inhaling gas, or other poisonous substances, whether taken voluntarily and consciously, or involuntarily and unconsciously.    In Manufacturing Co. v. Jones, 14 C. C. A. 30, 66 Fed. 124, a rule was advanced not inapplicable to this case.    The company there had for years been sending its agents throughout the country, making contracts with farmers for the erection of butter and cheese factories.    These contracts were drawn in such form as to make it debatable whether or not the subscribers to them became jointly and severally liable for the whole contract price of the factory, or to the extent only of the sum set opposite their names in the form of subscribers to stock.    Some courts decided that such subscribers became individually liable for the whole contract price, while other courts decided that they became liable only for the sum set opposite their names as stockholders.    Finally one of these cases reached the court of appeals, in the case just cited, and the court used this language:

"These conflicting decisions were presumably well known to the plaintiff company, but were unknown to the defendants.    Under these circumstances, it was the duty of the plaintiff to alter the form of its contract then in use so as to avoid the question whether it imposed a joint or a several liability, which had theretofore given rise to the conflicting decisions.    Not having done so, the plaintiff cannot complain if the courts adopt the construction of the contract which is most favorable to the defendants."

The language of Judge Taft in Indemnity Co. v. Dorgan, 7 C. C. A. 592, 58 Fed. 956, may be aptly applied as a conclusion to this discussion:

"It is a well-settled rule in the construction of insurance policies of this character, which the insured accepts for the purpose of covering all accidents, to construe all the language used to limit the liability of the company strictly against the company.    Policies are drawn by the legal advisers of the company, who study with care the decisions of the courts; and, with those in mind, attempt to limit as nearly as possible the scope of the insurance.    It

is only a fair rule, therefore, which courts have adopted, to resolve any doubt or ambiguity in favor of the insured, and against the insurer."

It is in this view of the relation sustained by this company to the state of New York, to which it owes its corporate life, that I feel constrained to overrule the motion in arrest of judgment.