## KING v. NEW YORK LIFE INS. CO. OF NEW YORK.

### No. 9923.

Circuit Court of Appeals, Eighth Circuit.

Aug. 15, 1934.

S. L. Winters, Henry J. Beal, and James W. Murphy, all of Omaha, Neb., for appellant.

Norris Brown, David A. Fitch, and Ralph M. West, all of Omaha, Neb., for appellee.

Before SANBORN and BOOTH, Circuit Judges, and BELL, District Judge.

BOOTH, Circuit Judge.

This is an appeal from a judgment entered after verdict directed for the defendant, New York Life Insurance Company, at the close of plaintiff's case.

The action was originally commenced in the state district court of Douglas county, Neb., but was duly removed to the United States District Court for the District of Nebraska, and was tried in the latter Court.

The main facts are not in dispute. February 13, 1926, the Insurance Company issued its policy insuring the life of John J.

King, husband of appellant, in the sum of $25,000, with a double indemnity clause on certain conditions. Appellant was the beneficiary in the policy.

The double indemnity clause in the policy sought to be recovered on was as follows (the heading being "Double Indemnity") :

"The Double Indemnity provided on the first page hereof shall be payable upon receipt of due proof that the death of the Insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means and occurred within ninety days after such injury.

"Double Indemnity shall not be payable if the insured's death resulted from self-destruction, whether sane or insane; from the taking of poison or inhaling of gas, whether voluntary or otherwise; from committing an assault or felony; from war or any act incident thereto; from engaging in riot or insurrection; from participation as a passenger or otherwise in aviation or aeronautics; or, directly or indirectly, from infirmity of mind or body, from illness or disease, or from any bacterial infection other than bacterial infection occurring in consequence of accidental and external bodily injury."

The policy sued upon also contained the following:

"New York Life Insurance Company * * * agrees to pay to Mary K. King, Wife of the Insured * * * Twenty-five Thousand Dollars (the face of this policy), upon receipt of due proof of the death of John J. King, the Insured, or Fifty Thousand Dollars (double the face of this policy), if such death resulted from accident as defined under 'Double Indemnity' on the second page hereof and subject to the provisions therein set forth."

The insured died May 12, 1932. The Insurance Company paid the principal sum of $25,000, but refused payment of the additional $25,000 under the double indemnity clause. It was agreed that the payment made should be without prejudice to the right of the beneficiary to sue for the additional amount under the double indemnity clause. The present suit was thereafter commenced.

The facts and circumstances relating to the cause of death of the insured, as disclosed by the record, are substantially as follows: Jerry Keogh, who lived with Mr. and Mrs. King, testified that he found King dead in the garage between 7 and 8 a. m. on May 12, 1932. King was found between two cars in his garage, one a Ford on the east side facing north,

the other a Chrysler facing north. There were two windows to the west in the garage. The lower part of the windows was broken out, and the door of the garage was ajar just wide enough to get in. King was in about the center of the garage with his head near the right rear wheel of the Chrysler, and his feet just at the running board opposite the west door of the Ford, which door was open about two-thirds against a post which was in the center of the garage. He was lying on the cement floor of the garage on his back, his head on the cement floor. His head was toward the west, and his feet toward the east. His head was about ten feet away from the open door of the garage.

Catherine Donovan, a cousin visiting at King's testified that she had used the Ford car all the day before, and that night up until about 12:30. She had difficulty the day before with shutting off the motor; when she stopped to get some oil at a gas station, she shut off the switch and it would bounce back again. The evening before, another key had been put in the ignition, and in trying to turn it, the key was broken off. When she came back to King's home that evening she put this car in the garage, and shut the door of the garage and fastened it, came into the house, and found King and his wife waiting for her. She showed them the broken key, and they asked her if she shut off the car, and she said she didn't know whether she did or not, but she guessed she did. King said something about how could you do it with the broken key, and then he said he would go out and see about it after awhile. All three talked there until about 2:30, and then the witness went to bed upstairs, and didn't see King after that. On cross-examination she testified that she didn't know but what she might have left the switch on and the engine running that night.

Dr. McCleneghan, coroner's physician, testified that he performed an autopsy on King on May 12, 1932, the date of his death, with Dr. William Melcher present. He noticed some slight abrasions below the knees; and his examination showed King's death was caused by carbon monoxide gas from the exhaust of a car. The blood in carbon monoxide poisoning is of a cherry red color, the muscles are also of a cherry red color, and the different organs, the liver, spleen, and kidneys, also have this peculiar red color; and these symptoms were all present in King's body. The abrasions were below the surface of the skin below each knee, and they were of recent origin. He found no objective signs

of injury to the head. He said the carbon monoxide gas got into his body by inhalation, by breathing the gas.

Jack King, seventeen year old son of King, testified that he drove the Ford car often and had difficulty with the switch in the same manner as Mrs. Donovan testified.

Other witnesses testified along the same line as to the condition of the Ford car.

In view of the foregoing testimony, it is conceded that the insured died as a result of carbon monoxide gas poisoning resulting from accidental means. There is no question of suicide involved.

The sole question at issue is whether the death was within the coverage of the policy.

The answer to this question depends upon the construction of the clause of the policy reading: "Double Indemnity shall not be payable if the Insured's death resulted * * * from the taking of poison or inhaling of gas, whether voluntary or otherwise."

This clause purports to contain an exception to the double liability and is one of a series of nine or ten exceptions mentioned in the policy.

The contention of appellant is that the insured "did not inhale said gas within the meaning of said exception, nor was said gas taken voluntarily or in any other intentional manner; but that the evidence showed that the deceased died as the result of breathing carbon monoxide gas unintentionally, and the jury could infer from the facts and circumstances, unconsciously"; and that, therefore, the court erred in holding that the death of insured came within the exception mentioned in the policy.

The main principles governing the construction of contracts of insurance are the same as those governing other contracts.

In Imperial Fire Ins. Co. v. Coos County, 151 U. S. 452, page 463, 14 S. Ct. 379, 381, 38 L. Ed. 231, the Supreme Court laid down the following rules: "But the rule is equally well settled that contracts of insurance, like other contracts, are to be construed according to the sense and meaning of the terms which the parties have used, and, if they are clear and unambiguous, their terms are to be taken and understood in their plain, ordinary, and popular sense." And also (page 462 of 151 U. S., 14 S. Ct. 379, 381): "* * * the insurer undertakes to guaranty the insured against loss or damage, upon the terms and conditions agreed upon, and upon no other, and, when called upon to pay in

case of loss, the insurer, therefore, may justly insist upon the fulfillment of these terms. If the insured cannot bring himself within the conditions of the policy, he is not entitled to recover for the loss. The terms of the policy constitute the measure of the insurer's liability, and, in order to recover, the assured must show himself within those terms. * * * It is immaterial to consider the reasons for the conditions or provisions on which the contract is made to terminate, or any other provision of the policy which has been accepted and agreed upon. It is enough that the parties have made certain terms conditions on which their contract shall continue or terminate. The courts may not make a contract for the parties. Their function and duty consist simply in enforcing and carrying out the one actually made."

These rules have been adopted unequivocally by this court. In the case of Hawkeye Commercial Men's Ass'n v. Christy (C. C. A.) 294 F. 208, the court, after quoting approvingly the rules laid down in the Imperial Fire Insurance Company Case, supra, and reviewing many cases, some of which are relied upon by appellant in the case at bar, speaking by Judge Walter H. Sanborn, and interpreting the contract of insurance there involved, said (page 212 of 294 F.) :

"Stripped of irrelevant parts, the portion of the contract which is decisive of the question at issue here reads in this way:

"'* * * Nor shall the association be liable for indemnity for any death resulting wholly or in part from * * * poisonous substances, gases, or anything accidentally, or otherwise, taken or inhaled. * * *'

"On the first reading of this stipulation, it seemed simple, its terms seemed unambiguous, and their plain, ordinary, and popular meaning clear. No suggestion arose in our minds that this clause of this contract relieved the defendant from liability for deaths from poisonous substances and gases taken or inhaled involuntarily, and did not exempt it from deaths from those taken or inhaled voluntarily, or that it relieved it from liability for deaths from such poisonous substances and gases taken or inhaled voluntarily, and did not exempt it from deaths from those taken involuntarily. We read nothing of that nature in the contract. No discrimination between these two classes of deaths appeared upon the face of it or was suggested to the mind.

"Nor have the opinions of the courts and the arguments and briefs of counsel divested

us of the abiding conviction that this stipulation was intended to, and by its clear and simple terms does, exempt the defendant from all liability for indemnity for any death from poisonous substances, gases, or anything taken or inhaled, voluntarily or involuntarily, consciously or unconsciously. By its express terms, without exception or limitation, it declares that the defendant shall not be liable for any death from poisonous substances, gases, or anything accidentally, or otherwise, taken or inhaled. A death from poisonous substances, gases or anything accidentally, or otherwise, involuntarily and unconsciously taken or inhaled, is as much a death from poisonous gases, or anything accidentally, or otherwise, taken or inhaled, as is a death from those poisonous substances, gases, or anything accidentally, or otherwise, voluntarily and consciously taken or inhaled; and there is nothing in the stipulation of exemption which expresses or intimates any difference or distinction between the defendant's liability for deaths from voluntarily taking or inhaling and for deaths from involuntarily taking or inhaling.

"The practical effect of the construction of this contract which counsel for the plaintiff seek would be to substitute for the existing contract that the association shall not be liable for indemnity for any death from poisonous gases, or anything accidentally, or otherwise, taken or inhaled, a contract that the defendant shall be liable for any death from poisonous substances, gases, or anything accidentally, or otherwise, taken or inhaled, except in cases where the poisonous substances were voluntarily and consciously taken and inhaled; a course of action that flies in the teeth of familiar rules of construction of contracts and statutes.

"The parties to insurance contracts have the right and power to contract for what accidents and risks the companies shall and for what accidents and risks they shall not be liable and the courts may not make new or different contracts for them. The function and duty of the courts consist simply in enforcing and carrying out the contract actually made by the parties. Imperial Fire Ins. Co. v. Coos County, 151 U. S. 452, 462, 14 S. Ct. 379, 38 L. Ed. 231.

"The natural, obvious meaning of the provisions of a contract should be preferred to any curious, hidden sense which nothing but the exigency of a hard case and the ingenuity of a trained and acute mind would discover. Delaware Ins. Co. v. Greer, 120 F. 916, 921, 57 C. C. A. 188, 61 L. R. A. 137; Standard Life & Accident Ins. Co. v. McNulty, 157 F. 224, 226, 85 C. C. A. 22."

Prior to the opinion of this court rendered in the Christy Case, there had been divergent views upon somewhat similar questions expressed in opinions by this court. See McGlother v. Provident Mutual Acc. Co. (C. C. A.) 89 F. 685; Fidelity & Casualty Co. v. Lowenstein (C. C. A.) 97 F. 17, 46 L. R. A. 450; see also Lowenstein v. Fid. & Cas. Co. (C. C.) 88 F. 474.

The Christy Case is amply supported by the authorities therein cited; and subsequent to the opinion in that case, we think there has been in this court no departure from the rules and principles approved or laid down therein. The authority of the Lowenstein Case must be considered as restricted to the particular facts involved.

In the recent case of Gorman v. Fidelity & Cas. Co. of New York, 55 F.(2d) 4, 5, this court, speaking by Judge Gardner, said:

"The decisions of this court are in harmony with the elementary principle that doubt and ambiguity in an insurance policy should be resolved in favor of the insured and against the insurer. It does not follow, however, that the terms of an insurance policy may be distorted from their natural meaning, or that the agreed liability of the insurer should be enlarged into one which only a new contract could have imposed, nor, indeed, that a court should indulge in scholastic subtleties to extend the rights of the insured. In the words of the late Judge Sanborn, referring to this rule of construction: 'But this rule ought not to be permitted to have the effect to make a plain agreement ambiguous, and then to interpret it in favor of the insured.' Standard Life & Accident Ins. Co. v. McNulty, supra.

"Courts should not be 'cunning and astute to evade, rather than quick to perceive and diligent to apply, the meaning of the words,' as manifestly intended by the parties."

In the recent case of Northern Trust Co., Trustee, v. Central Life Ins. Co., 274 Ill. App. 551, the opinion by the Appellate Court of the First District of Illinois held that there was no liability in case of an exception clause worded substantially as the clause in the case at bar. See, also, Birss v. Order of United Commercial Travelers, 109 Neb. 226, 190 N. W. 486.

We agree with the reasoning and with the conclusion reached in the Christy Case; and we agree with the court below in holding that that case is controlling here. There is

no substantial difference in the wording of the exception clause in the two cases. In the Christy Case the crucial words were, "poisonous substances, gases, or anything accidentally, or otherwise, taken or inhaled." In the case at bar, the language is, "from the taking of poison or inhaling of gas, whether voluntary or otherwise."

We think there is nothing ambiguous in the language used in the case at bar. The words employed are words in common use and have an ordinary meaning. We think the words, "the taking of poison or inhaling of gas, whether voluntary or otherwise," include both intentional and unintentional taking or inhaling. To give the clause the construction claimed by appellant would, in effect, be adding after the word "otherwise" some such words as "but nevertheless intentional." Such an addition would fall within the ban laid down by the Supreme Court in the Imperial Fire Ins. Company Case, supra, in the following language: "The courts may not make a contract for the parties. Their function and duty consist simply in enforcing and carrying out the one actually made."

We do not think it necessary to review the numerous cases cited by counsel for appellant in support of their views. They have been carefully and thoughtfully examined. In reference to some of them, we are content to adopt the language used by Judge Walter H. Sanborn in the opinion in the Christy Case (page 211 of 294 F.): "The opinions of the state courts, cited and considered, are entitled to and have received great respect and consideration, but they are not controlling authority in the federal courts on a question of commercial or general law, such as that presented by this suit. Nor do they relieve the members of this court from the duty of forming, declaring, and enforcing their own independent judgment upon it."

In reference to many of the cases cited by counsel for appellant, we would simply say that, in our opinion, they are plainly distinguishable from the case at bar. In some of them the word "inhaling" or "inhaled," used without any qualifying words, was held to mean a voluntary, intelligent act. Paul v. Travelers' Ins. Co., 112 N. Y. 472, 20 N. E. 347, 3 L. R. A. 443, 8 Am. St. Rep. 758; Menneiley v. Employers' Liability Assur. Corp., 148 N. Y. 596, 43 N. E. 54, 31 L. R. A. 686, 51 Am. St. Rep. 716; Pickett v. Pacific Mutual Life Ins. Co., 144 Pa. 79, 22 A. 871, 13 L. R. A. 661, 27 Am. St. Rep. 618; Fidelity & Cas. Co. v. Waterman, 161 Ill. 632, 44 N. E. 283, 32 L. R. A. 654; Fidelity &

Cas. Co. v. Lowenstein, supra; Kingsley v. American Central Life Ins. Co., 259 Mich. 53, 242 N. W. 836; U. S. Mutual Acc. Ass'n v. Newman, 84 Va. 52, 3 S. E. 805.

The same holding has been made in regard to the words "taken" or "taking." Dent v. Railway Mail Ass'n (C. C.) 183 F. 840, affirmed in Railway Mail Ass'n v. Dent, 213 F. 981, L. R. A. 1915A, 314 (C. C. A. 8); Travelers' Ins. Co. v. Dunlap, 160 Ill. 642, 43 N. E. 765, 52 Am. St. Rep. 355; Metropolitan Acc. Ass'n v. Froiland, 161 Ill. 30, 43 N. E. 766, 52 Am. St. Rep. 359; Dezell v. Fidelity & Cas. Co., 176 Mo. 253, 75 S. W. 1102.

Similar construction has been placed on such words as "self-administered." Republic Life & Acc. Ins. Co. v. Hatcher, 244 Ky. 574, 51 S.W.(2d) 922.

The question at issue in the case of Edwards v. Travelers' Life Ins. Co. (C. C.) 20 F. 661, affirmed in Travellers' Ins. Co. v. Edwards, 122 U. S. 457, 7 S. Ct. 1249, 30 L. Ed. 1178 (and in several other cases cited by appellant), was whether the insured committed suicide. The policy provided for no recovery if the insured "shall die by suicide, whether the act be voluntary or involuntary." The court charged the jury that in order to find a verdict for defendant, they must find that the insured took the poison knowingly and not by mistake. On motion for a new trial, this charge was held correct. In effect the court held that *intent* was one of the necessary elements of suicide, and that it would not be presumed that the Insurance Company had put into an explanatory clause that which nullified the usual and well-understood definition of the word sought to be explained.

The holding was in accord with the common meaning of the word "suicide." Such holding is supported by the definition of "suicide" in the commonly used dictionaries, such as Webster's International, The Century, and Funk & Wagnall's New Standard.

But there is no such necessary element of intent in the commonly accepted definition of the word "inhale," as is shown by the same lexicographic authorities. The element of intent may or not be present in the act of inhaling. In other words, the act may be voluntary or involuntary, conscious or unconscious. It was, therefore, entirely proper that an explanatory clause should be added. That clause reading, "whether voluntary or otherwise" is broad and sweeping. It does not nullify the definition of "inhaling"; it simply precludes any attempt at restriction.

We think the clause is so plain as not to be open to construction.

On principle and authority, we hold that the action of the trial court in directing a verdict for defendant was correct.

The judgment is affirmed.