HAMILTON v. McCLAUGHRY, Warden.

(Circuit Court, D. Kansas, First Division. April 12, 1905.)

No. 8,284.

1. WAR—COURTS-MARTIAL—JUDGMENTS.

Courts-martial being courts of inferior and limited jurisdiction, it must be made to clearly and affirmatively appear, in order to give effect to their judgments, that the court was legally constituted, that it had jurisdiction of the person and offense charged, and that its judgment imposed was conformable to law.

[Ed. Notes.—For cases in point, see vol. 4, Cent. Dig. Courts-Martial, § 90.]

2. SAME—HABEAS CORPUS.

Where, on return to a writ of habeas corpus, the respondent alleged that he held the petitioner under a judgment of conviction by a military court-martial, the burden is on the respondent to show that the judgment was based on some provision of positive law.

3. SAME—ARTICLES OF WAR—CONSTRUCTION.

Whether a condition of war exists, within the fifty-eighth article of war, relating to the trial of certain offenses committed by soldiers, is

within the exclusive jurisdiction of the political department of the government.

[Ed. Notes.—For cases in point, see vol. 4, Cent. Dig. Courts-Martial, § 95; vol. 48, Cent. Dig. War, § 217.]

4. SAME—"BOXER UPRISING."

The "Boxer Uprising" in China, in June, 1900, during which the United States assembled an army of 15,000 men, over 5,000 of which were ordered to and did proceed to China to assist the forces of allied nations in quelling the uprising and to release the accredited representatives of the United States then imprisoned within the city of Pekin, during which the pay of the officers and men in the United States military service was increased to a war basis, constituted "a time of war," within the fifty-eighth article of war, providing for the trial of certain offenses committed by soldiers in time of war by military court-martial.

E. R. Adams, for petitioner.
John S. Dean and Wm. G. Doane, for respondent.

POLLOCK, District Judge. This is an application for writ of habeas corpus. The return of respondent admits the restraint charged in the petition and seeks to justify upon the following state of facts:

On the 23d day of December, 1900, petitioner was a private in Troop K, Sixth Cavalry Regiment, Army of the United States, stationed at Camp Reilly, Pekin, China, having been ordered there to assist the allied powers in the protection of the foreign legations, and the suppression of what is commonly known as the "Boxer Uprising" in China. At that time and place petitioner shot and killed one Corporal Charley Cooper, of petitioner's regiment, for which offense petitioner was on February 4, 1901, tried by a court-martial convened and sitting at Pekin, China. The trial resulted in a judgment of conviction. The record of the proceedings, trial, conviction, and sentence reads as follows:

"Headquarters China Relief Expedition,
"Pekin, China, February 4, 1901.
"General Orders No. 6.

"(1) Before a General Court-Martial which convened at Pekin, China, pursuant to paragraph 5, Special Orders No. 1, January 2d, from these headquarters, and of which Colonel Charles F. Robe, 9th Infantry, was president, and Captain Charles R. Noyes, Adjutant, 9th Infantry, was Judge Advocate, was arraigned and tried Private Fred Hamilton, Troop K, 6th Cavalry.

"Charge: 'Murder, in violation of the 58th article of war.'

"Specification: In that Private Fred Hamilton, Troop K, 6th Cavalry, U. S. Army, did willfully, feloniously, and with malice aforethought inflict a wound on Corporal Charley Cooper, Troop K, 6th Cavalry, deceased, by firing a ball cartridge from a Colt's revolver, calibre 38, at said Cooper. From the effect of said wound, the said Cooper died almost immediately, about 8:25 p. m. on the 23d day of December, 1900. This at Camp Reilly, Pekin, China, about 8:25 p. m. on the 23d day of December, 1900.

"Pleas.

"To which the accused submitted the following plea in bar of trial: 'Want of jurisdiction of the court.'

"The special plea in bar of trial was overruled by the court-martial. The accused then pleaded as follows: To the specification: 'Not guilty.' To the charge: 'Not guilty.'

"Findings.

"Of the specification: 'Guilty.' Of the charge: 'Guilty.'

"Sentence.

"And the court doth therefore sentence him, Private Fred Hamilton, Troop K, 6th Cavalry, 'to be dishonorably discharged the service of the United States, forfeiting all pay and allowances due him, and to be confined at hard labor in such penitentiary as the reviewing authority may direct for the period of his natural life.'

"The proceedings, findings, and sentence is approved. The reviewing authority is of the opinion that the evidence presented shows that the accused, shortly before the commission of the crime, had been abused and maltreated by Corporal Cooper to a considerable degree, and therefore was laboring under some provocation. To this extent the severity of the crime is lessened, and because of it the reviewing authority is constrained to reduce that portion relating to confinement at hard labor to a period of twenty (20) years. As mitigated the sentence is confirmed and will be duly executed. The United States Penitentiary at Fort Leavenworth, Kansas, is designated as the place for the execution of so much of the sentence as relates to confinement at hard labor. The prisoner shall be sent to Alcatraz Island, California, at the first favorable opportunity, for transfer to the United States Penitentiary at Fort Leavenworth, Kansas.

"The General Court-Martial convened at Pekin, China, by paragraph 5, Special Orders No. 1, current series, from these Headquarters, is dissolved.

"By Command of Major General Chaffee:

"[Sgd.]          H. O. S. Heistand, Adjutant General.

"A true copy. R. B. Paddock, Captain 6th Cavalry.

"A true copy. R. W. McClaughry, Warden."

The fifty-eighth article of war, under which petitioner was tried and convicted, reads as follows:

"In time of war, insurrection or rebellion, larceny, robbery, * * * murder, * * * shall be punishable by the sentence of a general court-martial, when committed by persons in the military service of the United States, and the punishment in any such case shall not be less than the punishment provided for the like offense by the laws of the state, territory, or district in which such offense may have been committed."

It is the insistence of counsel for petitioner that at the time of the homicide there prevailed neither war, insurrection, nor rebellion, as required by the article of war above quoted to confer jurisdiction upon a general court-martial to try petitioner for the offense charged against him, and therefore the military court was without jurisdiction in the premises and its judgment void.

In approaching a consideration of this question, a few of the fundamental principles of law may be stated. It is the settled law that courts-martial are courts of inferior and limited jurisdiction. No presumptions in favor of their exercise of jurisdiction are indulged. To give effect to their judgments imposed, it must be made to clearly and affirmatively appear that the court was legally constituted, that it had jurisdiction of the person and offense charged, and that its judgment imposed is conformable to the law. Dynes v. Hoover, 20 How. 625, 15 L. Ed. 838; Runkle v. U. S., 122 U. S. 543, 7 Sup. Ct. 1141, 30 L. Ed. 1167. The judgments of such courts may be called in question in a collateral proceeding. Ex parte Watkins, 3 Pet. 193, 7 L. Ed. 650; Wise v. Withers, 3 Cranch, 331, 2 L. Ed. 457. Again, so jealous are all English-speaking nations of the liberty of their subjects, where a respondent in

habeas corpus admits the restraint charged against him, he must justify by basing his right of restraint upon the exercise of some provision of positive law binding upon him, or the writ must issue and the person restrained have his liberty. It follows, therefore, notwithstanding the judgment of conviction by the military court set forth in the return of respondent and admitted by petitioner, if, as claimed by counsel for petitioner, the facts essential to a valid exercise of the military power conferred by the fifty-eighth article of war, to wit, the then existence of a state of war, insurrection, or rebellion in China, the place where the offense was committed and the trial had, is not shown, the writ must go and the petitioner be granted his liberty.

It is conceded in the briefs and argument of counsel for respondent that the terms "insurrection" and "rebellion," used in the article of war, mean insurrection or rebellion against this government, and not another; but it is contended that at the time of the homicide such a condition of war existed in China, in which condition of war this government, under the authority of the Department of War, was a participant, as to authorize the exercise of military power to punish one in the military service of the United States, then in that country, for the commission of the crimes enumerated in the fifty-eighth article of war, by a general court-martial. The question thus presented for determination is one of first instance and large importance.

As shown by the record, during the military occupation of China by the troops of this government, no less than 271 trials by general court-martial were had, which resulted in 244 convictions. Under the well-settled principles of law the offenders so tried were not amenable to the laws of the government of China, and the offenses by them committed, if any, whether by the laws of this country denominated as the crime of murder, robbery, larceny, or other felony, were not committed in violation of any law of China, because done by persons in the military service of this country while stationed in China. In Coleman v. Tennessee, 97 U. S. 509, 24 L. Ed. 1118, Mr. Justice Field, delivering the opinion of the court, said:

"It is well settled that a foreign army, permitted to march through a friendly country or to be stationed in it by permission of its government or sovereign, is exempt from the civil and criminal jurisdiction of the place. The sovereign is understood, said this court in the celebrated case of The Exchange, 7 Cranch, 139 [3 L. Ed. 287], to cede a portion of his territorial jurisdiction when he allows the troops of a foreign prince to pass through his dominions. 'In such case, without any express declaration waiving jurisdiction over the army to which this right of passage has been granted, the sovereign who should attempt to exercise it would certainly be considered as violating his faith. By exercising it the purpose for which the free passage was granted would be defeated, and a portion of the military force of a foreign independent nation would be diverted from those national objects and duties to which it was applicable, and would be withdrawn from the control of the sovereign whose power and whose safety might greatly depend on retaining the exclusive command and disposition of this force. The grant of a free passage, therefore, implies a waiver of all jurisdiction over the troops during their passage, and permits the foreign general to use that discipline and to inflict those punishments which the government of his army may require.'

If an army marching through a friendly country would thus be exempt from its civil and criminal jurisdiction, a fortiori would an army invading an enemy's country be exempt. The fact that war is waged between two countries negatives the possibility of jurisdiction being exercised by the tribunals of the one country over persons engaged in the military service of the other for offenses committed while in such service. Aside from this want of jurisdiction, there would be something incongruous and absurd in permitting an officer or soldier of an invading army to be tried by his enemy, whose country he had invaded."

To like effect is the language employed by the same justice in rendering the opinion in Dow v. Johnson, 100 U. S. 158, 25 L. Ed. 632.

"As was observed in the recent case of Coleman v. Tennessee, it is well settled that a foreign army, permitted to march through a friendly country, or to be stationed in it by authority of its sovereign or government, is exempt from its civil and criminal jurisdiction. The law was so stated in the celebrated case of The Exchange, reported in 7 Cranch, 139 [3 L. Ed. 287]. Much more must this exemption prevail where a hostile army invades an enemy's country. * * * In both instances, from the very nature of war, the tribunals of the enemy must be without jurisdiction to sit in judgment upon the military conduct of the officers and soldiers of the invading army. It is difficult to reason upon a proposition so manifest. Its correctness is evident upon its bare announcement, and no additional force can be given to it by any amount of statement as to the proper conduct of war."

It therefore must follow, of necessity, if any punishment shall be meted out for the many crimes committed by persons in the military service of the United States during the occupation of China, such punishment must be imposed under the fifty-eighth article of war or the offender go unpunished; and this is true, whether the military occupation of China by the forces of this government was by or against the consent of the government of China. That is to say, if the homicide committed is an offense at all, it was an offense committed in violation of the military laws of this country, transplanted to China, under the authority of the military department of this government, for the government of our military forces while there engaged in operations against the "Boxer Uprising," and for the protection of the citizens and representatives of this government and their property.

Again, it is the well-settled law that the existence of a condition of war must be determined by the political department of the government; that the courts take judicial notice of such determination and are bound thereby. U. S. v. 129 Packages, Fed. Cas. No. 15,941; Sutton v. Tiller, 98 Am. Dec. 471.

Mr. Justice Grier, delivering the opinion in Prize Cases, 67 U. S. (2 Black) 666, 17 L. Ed. 459, says: "War has been well defined to be that state in which a nation prosecutes its right by force." In the present case, at no time was there any formal declaration of war by the political department of this government against either the government of China or the "Boxer" element of that government. A formal declaration of war, however, is unnecessary to constitute a condition of war. Adopting the definition of war above quoted with approval by the Supreme Court, the question here is whether this government was, at the time of the commission of the homicide

by petitioner, prosecuting its right in Chinese territory by force of arms. It has been well said the safety of the people is the supreme law of the land. The first duty of a state is the protection of the lives and property of its citizens, wherever lawfully situate, by peaceable means, if possible; if not, by force of arms. More especially must this protection be afforded the accredited representatives of this government in a foreign country.

These premises conceded, as I think they must be, it follows, of necessity, when the armed forces of this government, by authority of the Department of War, are commissioned to enforce the lawful demands of this government against a foreign country, or to protect the lives of citizens lawfully stationed in a foreign country, or the accredited representatives of this government in such foreign country, there must exist military jurisdiction and power to enforce such discipline among the troops as will command the respect of foreign nations, assure the safety of the nonoffending citizens of such foreign nation and their property, and protect the lives of the citizens of this country engaged in such military operations. With these fundamental principles of law and government as a basis for decision, what are the facts in the case, as gleaned from the evidence offered, and did there exist in China at the time the homicide in question was committed a state of war; that is to say, was this government there in China at the time prosecuting its right by force of arms?

The "Boxer" trouble arose in China in the month of June, 1900. It consisted of armed forces, dominated by the spirit of driving from that country or destroying all foreigners, including the accredited representatives of this and other nations, and the destruction of their property. It assumed such proportions that the Chinese government was either to weak to cope with it, or, as may be supposed, the governmental authorities of that nation, while protesting good faith, were in actual collusion with the "Boxer" element. The trouble spread until anarchy reigned and the lives and property of all foreigners within the territorial limits of that government, unless at protected ports, were threatened and liable to destruction. In this state of affairs, this government, acting in conjunction with other foreign nations, assembled an army of about 15,000 men, over 5,000 of which, under command of Gen. Chaffee, were ordered to and did proceed to China to assist the forces of other nations in quelling the uprising and to release foreign legations to that country, then imprisoned within the walls of Pekin, the capital city. Between the allied forces and about 30,000 armed Chinese there were fought many engagements, resulting in a considerable loss of life to the forces of this government. The capital city, Pekin, was besieged and captured, and the legations there confined released. Military zones were formed, and at the time of the homicide in question the legation from this government to China, and the legations of other foreign governments, were guarded and protected by the troops there assembled. Occupation of Chinese territory was held until that government gave assurance of both its ability and willingness to maintain order and protect

the lives and property of the citizens and legations of foreign countries, which occupation was continued until long after the commission of the homicide in question.

By act of Congress the pay of the officers and men in the military service of this country during the time they were occupied in China was increased to the amount paid in time of actual war, notwithstanding the fact that during all the time of the military occupation of China by this and other foreign nations the government of China maintained with this and the other foreign nations engaged in such occupation a footing of peace, and notwithstanding the further fact that at no time was there any declaration of war on the part of this government against the government of China. Yet I am constrained to hold that by reason of the occupation of Chinese territory by the large military force of this government, under authority of the Department of War, the many conflicts between the forces of this government and the armed Chinese troops, and the recognition of a condition of war by the Congress of the United States in making payment to the officers and men of this government there engaged on a war basis and all the other facts and circumstances in this case, at the time the homicide in question was committed there prevailed in China a condition of war, within the spirit and intent of the fifty-eighth article of war, for that this government was there asserting its right of protection over the citizens and accredited representatives of this government, and their property, by force of arms; that the essential and requisite jurisdictional facts authorizing a trial of petitioner by a general court-martial, under the provisions of the fifty-eighth article of war, did and must of necessity be held to have existed; and that the judgment of that court must be upheld and enforced, and the writ denied.

It is so ordered.