# Presidential Authority to Permit Incursion Into Communist Sanctuaries in the Cambodia-Vietnam Border Area

Congress has clearly affirmed the President's authority to take all necessary measures to protect U.S. troops in Southeast Asia. Having determined that the incursion into the Cambodia-Vietnam border area is such a necessary measure, the President has clear authority to order it.

The President's action with respect to the Cambodian border area, limited in time and in geography, is consistent with the purposes which the Executive and the Congress have pursued since 1964. Whatever theoretical arguments might be raised with respect to the authority of the Commander in Chief to act alone had there been no congressional sanction for our involvement in Southeast Asia, there is no doubt as to the constitutionality of the action in light of the prior affirmance of Congress that the Commander in Chief take all necessary measures to protect U.S. forces in Vietnam. Having determined the necessity, the Commander in Chief has the constitutional authority to act.

May 14, 1970

MEMORANDUM OPINION FOR THE SPECIAL COUNSEL TO THE PRESIDENT[*]

Although the authority to declare war is vested in the Congress, the President as Commander in Chief and sole organ of foreign affairs has constitutional authority to engage U.S. forces in limited conflict. International law has long recognized a distinction between formal declared wars and undeclared armed conflicts. While the precise division of constitutional authority between President and Congress in conflicts short of all-out war has never been formally delimited, there is no doubt that the President with the affirmance of Congress may engage in such conflicts.

Congress has clearly affirmed the President's authority to take all necessary measures to protect U.S. troops in Southeast Asia. Having determined that the incursion into the Cambodian border area is such a necessary measure, the President has clear authority to order it.

---

[*] Editor's Note: This memorandum was addressed to Charles W. Colson, Special Counsel to the President. The cover memorandum explained as follows: "Attached is a memorandum regarding the authority of the President to permit incursion into Communist sanctuaries in the Cambodia-Vietnam border area." As a postscript, the cover memorandum noted: "(Copy of 'The Legality of U.S. Participation in the Defense of Vietnam,' reprinted from the Department of State Bulletin, and 'The Legality of the United States Position in Vietnam' by Eberhard P. Deutsch, Chairman of the American Bar Association Committee on Peace and Law Through United Nations, also sent.)" On April 30, 1970, two weeks before the completion of this opinion, President Nixon had announced that "a combined American and South Vietnamese operation" would target North Vietnamese "sanctuaries on the Cambodian-Vietnam border." Address to the Nation on the Situation in Southeast Asia, *Pub. Papers of Pres. Richard M. Nixon* 405, 407 (1970).

## I. The Commander in Chief Has Constitutional Authority to Engage U.S. Forces in Limited Conflicts, Which Is Unquestioned When He Has the Affirmance of Congress

### A. Constitutional Authority

The constitutional provisions which relate to the use of armed force divide authority between the Congress and the President. Congress has the authority to provide for the common defense (art. I, § 8, cl. 1), to declare war (art. I, § 8, cl. 11), to raise and support armies (art. I, § 8, cl. 12), to provide and maintain a navy (art. I, § 8, cl. 13), and to make rules for governing the armed forces (art. I, § 8, cl. 14). The President is designated Commander in Chief of the armed forces (art. II, § 2, cl. 1). He is vested with the "executive Power" (art. II, § 1, cl. 1) and is charged with the duty to take care that the laws be faithfully executed (art. II, § 3). The nature of the executive power, as emphasized in the express authority to make treaties, appoint ambassadors (art. II, § 2, cl. 2), and receive ambassadors (art. II, § 3), includes the authority to conduct the nation's foreign affairs. "The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936) (internal quotation omitted).

This division of authority, lacking precise delimitations, was clearly intended by the original draftsmen of the Constitution. They rejected the power of kings to commit unwilling nations to war to further their own international political objectives. At the same time, they recognized the need for quick executive response to rapidly developing international situations. The accommodation of these two interests—the prohibition of one-man commitment of a nation to war and the need for prompt executive response to international situations—was reflected in the Constitutional Convention's decision to change the original wording from the power of Congress to *make* war to the power to Congress to *declare* war. The Founding Fathers intended to distinguish between the initiation of armed conflict, which is for Congress to determine, and armed response to conflict situations, which the Executive may undertake. *See* 3 *The Papers of James Madison* 1351–53 (Henry D. Gilpin ed., 1841); 2 *The Records of the Federal Convention of 1787* 318–19 (Max Farrand ed., 1966).

### B. Distinction Between War and Limited Conflict

International Law has long recognized that countries engage in many forms of armed conflict short of all-out war. These include pacific blockades or quarantines, retaliatory bombardments and even sustained but limited combat. 2 Charles Cheney Hyde, *International Law: Chiefly as Interpreted and Applied by the United States* §§ 586–592 (2d rev. ed. 1945); 2 L. Oppenheim, *International Law: A Treatise* §§ 26–56 (H. Lauterpacht ed., 7th ed. 1952). Early in our history, the

Supreme Court described these differences between war and armed conflict using the terms "solemn war" and "imperfect war":

> If it be declared in form, it is called *solemn*, and is of the perfect kind; because one whole nation is at war with another whole nation; and *all* the members of the nation declaring war, are authorised to commit hostilities against all the members of the other, in every place, and under every circumstance. In such a war all the members act under a general authority, and all the rights and consequences of war attach to their condition.
>
> But hostilities may subsist between two nations more confined in its nature and extent; being limited as to places, persons, and things; and this is more properly termed *imperfect war*; because not solemn, and because those who are authorized to commit hostilities, act under special authority, and can go no farther than to the extent of their commission.

*Bas v. Tingy (The Eliza)*, 4 U.S. (4 Dall.) 37, 40 (1800) (opinion of Washington, J.).

While the Court termed both forms of military action "war," it marked the clear distinction between declared war, as we have seen in this century in the two World Wars, and undeclared armed conflicts, such as we have seen in Korea and in Southeast Asia.

### C. Historic Recognition of Distinction

As has been chronicled many times, the United States throughout its history has been involved in armed conflicts short of all-out or declared war, from the Undeclared War with France in 1798–1800 to Vietnam. *See, e.g.*, H.R. Rep. No. 82-127 (1951); H.R. Doc. No. 84-443 (1956); James Grafton Rogers, *World Policing and the Constitution* 92–123 (1945). The precise number of involvements is a matter of some dispute, as is the legitimacy of them. Nevertheless they did occur and throw considerable light on the constitutional division of powers between the President and the Congress.

On some occasions in our history, such as the Undeclared War with France and the Cuban Missile Crisis, Congress has, in advance, authorized military action by the President without declaring war. Act of July 9, 1798, ch. 68, 1 Stat. 578; Pub. L. No. 87-733, 76 Stat. 697 (1962). Chief Justice Marshall, however, raised the question whether such authorization was necessary for the President to act with regard to the early conflict with France:

> It is by no means clear that the president of the *United States* whose high duty it is to "take care that the laws be faithfully execut-

ed," and who is commander in chief of the armies and navies of the *United States*, might not, without any special authority for that purpose, in the then existing state of things, have empowered the officers commanding the armed vessels of the *United States*, to seize and send into port for adjudication, *American* vessels which were forfeited by being engaged in this illicit commerce.

*Little v. Barreme*, 6 U.S. (2 Cranch) 170, 177 (1804). He held, however, where Congress has prescribed one course of action, the President is not free to choose another. *Id.* at 177–78.

There have been other times in history, such as the Mexican and Civil Wars, where Congress has ratified armed actions, previously undertaken by the President. The Supreme Court has upheld the authority of the President to act prior to the action of Congress. Citing the Mexican War as an example, Justice Grier upheld Lincoln's imposition of a blockade prior to the convening of Congress. *The Prize Cases*, 67 U.S. (2 Black) 635, 659–60 (1863).

Frequently, Presidents have committed our armed forces to limited conflicts without any prior approval or direct ratification by Congress. President McKinley's action in committing 5,000 troops to an international force during the Boxer rebellion is a notable example. While Congress recognized the existence of the conflict, as evidenced by provision for combat pay (Act of Mar. 2, 1901, ch. 803, 31 Stat. 895, 903), it did not declare war nor formally endorse the action. A federal court, however, reiterated the early recognition of limited or undeclared war:

> In the present case, at no time was there any formal declaration of war by the political department of this government against either the government of China or the "Boxer" element of that government. A formal declaration of war, however, is unnecessary to constitute a condition of war.

*Hamilton v. McClaughry*, 136 F. 445, 449 (C.C.D. Kan. 1905).

President Taft more than once committed American troops abroad to protect American interests. In his annual report to Congress in 1912, he reported the sending of some 2,000 Marines to Nicaragua and the use of warships and troops in Cuba. H.R. Doc. No. 62-927, at 8–9, 21 (1912). He merely advised Congress of these actions without requesting any statutory authorization. President Wilson ordered General Pershing and more than 10,000 troops into Mexico in 1917 and committed approximately 12,000 troops to allied actions in Russia in 1918 to 1920. No congressional action was requested or taken.

The authority of the President to commit troops in limited conflict is not, of course, unquestioned. There are Presidents who have doubted such authority and Congress has challenged it more than once. President Truman's commitment of troops in Korea in response to a United Nations ("U.N.") resolution (S.C. Res. 83,

U.N. Doc. S/RES/83 (June 27, 1950)) without prior approval of, or subsequent ratification by, Congress led to the Great Debate of 1951.

President Truman had relied upon his authority as Commander in Chief and upon resolutions of the U.N. Security Council declaring that armed aggression existed in Korea and calling upon U.N. members to assist in halting that aggression. He cited the history of actions by the Commander in Chief to protect American interests abroad. He characterized the U.N. Charter as the cornerstone or our foreign relations and singled out Article 39 which authorizes the Security Council to recommend action to members to meet armed aggression.

The President's opponents noted that all treaties are not self-executing and that, until implemented by Congress, non-self-executing treaties confer no new authority on the President. Article 39, it was said, was not self-executing. Article 43, which provides expressly for the commitment of troops by members in accordance with their constitutional processes, had been implemented to the extent of Congress authorizing troop agreements (United Nations Participation Act of 1945, Pub. L. No. 79-264, § 6, 59 Stat. 619, 621) but since no agreements had been entered into it was inoperative. Without any added treaty authorization, the President's action must be viewed solely in terms of his basic constitutional authority, it was said, and this authority does not extend to long-term commitment of troops in numbers ranging up to 250,000.

While various scholarly views were quoted on both sides of the issue (H.R. Rep. No. 82-127 (1951)) and the congressional debate raged from January to April, there was no legal resolution of the President's authority in light of the U.N. Charter or independent of it. Nevertheless it is clear that Congress acquiesced in the President's action. *See* David Rees, *Korea: The Limited War* (1964); Merlo J. Pusey, *The Way We Go To War* (1969).

Since judicial precedents are virtually non-existent on this point, the question is one which must of necessity be decided by historical practice. Viewed in this light, congressional acquiescence in President Truman's action furnishes strong evidence that this use of his power as Commander in Chief was a proper one. This is particularly true because, while a treaty may override a state statute under the supremacy clause, *Missouri v. Holland*, 252 U.S. 416 (1920), it may not override a specific limitation on the power of the President or of Congress, *Reid v. Covert*, 354 U.S. 1 (1957).

## D. The Constitutional Posture Today

Under our Constitution it is clear that Congress has the sole authority to declare formal, all-out war. It is equally clear that the President has the authority to respond immediately to attack both at home and abroad. Between these two lies the grey area of commitment of troops in armed conflict abroad under either American or international auspices. In this area, both the Congress and the President have acted in the past. There has been dispute, often bitter, as to how far the

President may go alone on his constitutional authority. To date, however, it has always been resolved in the political arena without final constitutional determination by the courts, and without a head-on clash between the Congress and the President. Whatever and wherever the line may be between congressional and presidential authority a House committee accurately observes: "'Acting together, there can be no doubt that all the constitutional powers necessary to meet the situation are present.'" H.R. Rep. No. 88-1708, at 4 (1964) (committee report on Gulf of Tonkin resolution, quoting committee report on Formosa resolution).

## II. Congress Has Affirmed the President's Authority to Take Necessary Action to Protect U.S. Troops in Southeast Asia

Although U.S. concern with the security of Southeast Asia dates from our involvement there during World War II, it was formalized in the signing and ratification of the Southeast Asia Collective Defense Treaty. The area covered by the treaty includes not only the territory of the Asian signatories but also the States designated in the protocol which was signed and ratified at the same time as the treaty. These are Cambodia, Laos and the free territory under the jurisdiction of the State of Vietnam. Pursuant to its treaty obligation, the United States for some years maintained military advisers in Vietnam and provided other military assistance to the Republic of Vietnam.

When U.S. naval forces in the Gulf of Tonkin were attacked in August 1964, the President took direct air action against the North Vietnamese. He also requested Congress "to join in affirming the national determination that all such attacks will be met" and asked for "a resolution expressing the support of the Congress for all necessary action to protect our Armed Forces and to assist nations covered by the SEATO [Southeast Asia Treaty Organization]Treaty." H.R. Doc. No. 88-333, at 2 (1964).

On August 10, 1964, Congress responded with a resolution which "approves and supports the determination of the President, as Commander in Chief, to take all necessary measures to repel any armed attack against the forces of the United States and to prevent further aggression." Pub. L. No. 88-408, § 1, 78 Stat. 384, 384. It was in connection with this resolution that Congress noted that whatever the limits of the President acting alone might be, whenever Congress and the President act together "'there can be no doubt'" of the constitutional authority. H.R. Rep. No. 88-1708, at 4 (1964) (committee report on Gulf of Tonkin resolution, quoting committee report on Formosa resolution).

In the debates in the Senate on this resolution it is clear that the Commander in Chief was supported in taking whatever steps were necessary in his judgment to protect American forces. The floor leader, Senator Fulbright, noted on August 6, 1964 that the resolution "would authorize whatever the Commander in Chief feels is necessary." 110 Cong. Rec. 18,403. He observed: "In a broad sense, the joint resolution states that we approve of the action taken with regard to the attack on

our own ships, and that we also approve of our country's effort to maintain the independence of South Vietnam." *Id.* at 18,407. When Senator Cooper inquired: "In other words we are now giving the President advance authority to take whatever action he may deem necessary respecting South Vietnam and its defense, or with respect to the defense of any other country included in the treaty?," Senator Fulbright replied: "I think that is correct." *Id.* at 18,409.

The Gulf of Tonkin Resolution expresses broad support for the Commander in Chief and recognizes the need for broad latitude to respond to situations which may develop. Pub. L. No. 88-408, 78 Stat. 384 (1964). Of particular concern to the Congress, as well as to the President, was the protection of American forces and the security of South Vietnam.

While the Gulf of Tonkin Resolution was the first major congressional affirmation of the President's actions in responding to the situation in Southeast Asia, it is not the only such affirmation. When bombing of military targets in North Vietnam was undertaken in 1965, the President requested a supplemental appropriation for the military. In his message of May 4, 1965, he emphasized:

> This is not a routine appropriation. For each Member of Congress who supports this request is also voting to persist in our effort to halt Communist aggression in South Vietnam. Each is saying that the Congress and the President stand united before the world in joint determination that the independence of South Vietnam shall be preserved and Communist attack will not succeed.

H.R. Doc. No. 89-157, at 1 (1965).

The requested resolution was adopted on May 7, 1965. Pub. L. No. 89-18, 79 Stat. 109.

Since that time Congress has repeatedly adopted legislation recognizing the situation in Southeast Asia, providing funds to carry on U.S. commitments and providing special benefits for troops stationed there. There is long-standing congressional recognition of the U.S. commitment in Southeast Asia.

### III. The President's Action With Respect to Cambodia Is Consistent With His Obligations as Commander in Chief and With Congressional Policy Regarding Southeast Asia

Recognizing that Communist troops have been occupying territory on the Vietnam-Cambodian border and using it as a sanctuary from which to launch their attacks into Vietnam and against American forces there, the Commander in Chief has ordered limited incursions into this border area in order to destroy the sanctuaries. He has made a tactical judgment consonant with his responsibility as Commander in Chief, and consistent with the announced congressional policy of

taking "all necessary measures to repel any armed attack against the forces of the United States and to prevent further aggression."

As noted in Part I above, from the time of the drafting of the Constitution it has been clear that the Commander in Chief has the authority to take prompt action to protect American lives in situations of armed conflict. Whether it be a formal war declared by Congress or an undeclared war, it is the Commander in Chief who determines how war will be made and what tactics are necessary to protect American lives.

In ratifying the SEATO Treaty and accompanying protocol, Congress has recognized the close security link among the various nations in the area. In adopting the Gulf of Tonkin Resolution, it affirmed its determination to protect U.S. forces in the area. In supporting the supplemental appropriation in 1965, it recognized that the protection of U.S. troops and the prevention of infiltration might necessitate going beyond the boundaries of South Vietnam.

The President's action with respect to the Cambodian border area, limited in time and in geography, is consistent with the purposes which the Executive and the Congress have pursued since 1964. Whatever theoretical arguments might be raised with respect to the authority of the Commander in Chief to act alone had there been no congressional sanction for our involvement in Southeast Asia, there is no doubt as to the constitutionality of the action in light of the prior affirmance of Congress that the Commander in Chief take all necessary measures to protect U.S. forces in Vietnam. Having determined the necessity, the Commander in Chief has the constitutional authority to act.

WILLIAM H. REHNQUIST
*Assistant Attorney General*
*Office of Legal Counsel*